Filed 9/30/15

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re LIAM L. et al., Persons Coming Under the Juvenile Court Law. | D067729 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY et al., | (Super. Ct. No. SJ12956B-D) |
| Plaintiffs and Respondents, | |
| v. | |
| CHRISTINE L., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Kimberlee A. Lagotta, Judge. Affirmed.

Jasmine Turner-Bond, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Dana C. Shoffner, Deputy County Counsel, for Plaintiff and Respondent San Diego County Health and Human Services Agency.

Pamela Rae Tripp, under appointment by the Court of Appeal, for Plaintiff and Respondent J.L.

Neil R. Trop, under appointment by the Court of Appeal, for Minors.

Christine L. appeals a placement order in the juvenile dependency case of her minor children Liam L., M.L., and Angel L.  The order, made at the 12-month review hearing, placed the minors with their presumed father and noncustodial parent, J.L.  Christine contends the evidence does not support the juvenile court's finding that the minors' placement with J.L. would not be detrimental under Welfare and Institutions Code section 361.2, subdivision (a).[1]

Section 361.2, subdivision (a) requires that a dependant minor who has been removed from his or her custodial parent be placed with the minors' noncustodial parent, if that parent requests custody, unless such placement would be detrimental to the minor.  By its terms, and under our Supreme Court's decision in *In re Zacharia D.* (1993) 6 Cal.4th 435, 453 (*Zacharia D.*), that statute applies only when the minor is first removed from the custodial parent, generally at the time of the disposition hearing.  Under the current statutory scheme, a noncustodial parent who requests placement or custody for the first time *after* disposition must file a modification petition under section 388 to make such a request.  As we will explain, given the underlying

_____

[1]    Further statutory references are to the Welfare and Institutions Code unless otherwise specified.

2

presumption in California's dependency scheme that a minor should be placed with a noncustodial parent, absent a finding of detriment, such a placement is inherently in the minors' best interests.[2]  A noncustodial parent under these circumstances who files a section 388 petition is therefore entitled to custody unless the party opposing placement establishes that placement with the noncustodial parent would be detrimental to the minors' safety, protection or physical or emotional well-being.

In this appeal, we conclude that J.L.'s failure to file a section 388 petition was harmless because the issue of placement with J.L. was before the court with the consent of all parties.  We further conclude that the juvenile court's finding that the minors' placement with J.L. would not be detrimental was supported by substantial evidence.  We therefore affirm the juvenile court's placement order.

### FACTUAL AND PROCEDURAL BACKGROUND

"In accord with the usual rules on appeal, we state the facts in the manner most favorable to the dependency court's order."  (*In re Janee W.* (2006) 140 Cal.App.4th 1444, 1448, fn. 1 (*Janee W.*).)

On October 26, 2013, the San Diego County Health and Human Services Agency (the Agency) petitioned the juvenile court under section 300, subdivision (j), on behalf of nine-year-old Liam, eight-year-old M.L. and six-year-old Angel.  The Agency alleged that Christine had physically abused the minors' older half brother, Jonah L., by stomping

---

[2]    We expressly do not consider whether this presumption (and resulting analysis) would still be applicable if the noncustodial parent participates in reunification services, the parent fails to make substantial progress, the court terminates those services, and the court sets a selection and implementation hearing under section 366.26.

3

on Jonah's chest and headbutting him during an argument.[3]  The Agency further alleged that Christine hit the minors with hangers, spoons and brooms and regularly assaulted her mother, R.L.  The family, including R.L., lived in a single motel room.  The Agency concluded the minors were at substantial risk of suffering serious physical harm from Christine.

At the minors' detention hearing, the court found the Agency had made a prima facie showing under section 300, subdivision (j) and ordered that the minors be detained in out-of-home care.  Christine told the Agency that J.L. was the minors' father.  Christine did not have contact information for J.L., and she said he had not seen the minors for five years.  At the detention hearing, the court found J.L. to be the minors' presumed father under Family Code section 7573.

J.L. learned about the dependency proceedings from friends and called the Agency.  J.L. confirmed he had not seen the minors for five years.  J.L. told the Agency he previously lived in San Diego, but he separated from Christine and moved to Kansas in 2007.  While J.L. lived in San Diego, he abused alcohol and would drink every day.  J.L. and Christine argued and fought "all of the time."  J.L. described the fights as verbal arguments, though he said Christine sometimes punched him or threw things when she was upset.  Once J.L. left San Diego, and met his current wife, he began to recover from his alcohol addiction.  J.L. and his wife have a young child together.  J.L. reported that he had a high school diploma and was employed.

---

3      Jonah is not a party to this appeal.  He will be discussed only where necessary for an understanding of the issues raised by Christine.

J.L. told the Agency he tried to contact Christine and the minors, but Christine would not let him speak to them. J.L. said he would like to have custody of the minors "in the long run," but he understood he did not currently have a relationship with them. J.L. was in favor of the minors' placement with R.L., their maternal grandmother. (Several days after the detention hearing, the minors and Jonah were placed with R.L.) J.L. told the Agency he understood he could legally demand custody, but he did not want to break the minors' bond with R.L. Instead, he wanted to build a bond with the minors himself and eventually let the minors choose where to live. J.L. wanted to start talking with the minors on the phone and perhaps have them visit Kansas over the summer. J.L. said, however, " 'If I am put in a situation where I need to have my kids in my care right away, I'll do it and adapt. Whether it is to make space for the[m] where I am or to get a bigger house.' "

Jonah told the Agency he was happy for his half siblings that J.L. had been found. Jonah told the Agency that Christine separated from J.L. because J.L. "was an alcoholic and would get rowdy. My mom didn't want us in that environment and decided to leave him."

In conversations with the Agency, Christine admitted headbutting Jonah, hitting the minors with wooden spoons and using other forms of physical discipline. Christine also admitted using marijuana regularly, but she denied doing so in front of the minors. Christine recounted a history of domestic violence, especially violence inflicted by a romantic partner in Texas. As to J.L., Christine said he was an alcoholic and they argued all the time. Christine also reported that J.L. was "verbally abusive" and once "kicked

[her] in the stomach while [she] was pregnant." Christine told the Agency she suffered from depression and often felt suicidal.

In advance of the minors' jurisdiction and disposition hearing, Christine submitted on the allegations of the Agency's petitions. The court sustained the allegations of the petitions, removed the minors from Christine's custody and ordered reunification services for Christine. The court ordered the Agency to submit a case plan for J.L. and requested an expedited evaluation of J.L.'s home under the Interstate Compact on the Placement of Children (ICPC). The court granted supervised visitation to J.L. and granted the Agency discretion to allow unsupervised visitation. The court set a special hearing to address J.L.'s ICPC evaluation, among other things and scheduled six- and 12-month review hearings.

At the special hearing, the court accepted the Agency's case plan for J.L. and requested that Kansas commence its ICPC evaluation of J.L.'s home. The case plan's objectives for J.L. were to "[d]evelop positive support systems with friends and family" and "[b]e nurturing and supportive when you visit your child(ren)." The case plan provided for unsupervised telephone calls with the minors and unsupervised visitation if J.L. traveled to San Diego. The case plan also provided for visitation in Kansas once J.L. had received ICPC approval. The Agency did not require J.L. to participate in any reunification services.

In advance of the minors' six-month review hearing, the Agency reported that J.L. was participating in the ICPC process. In Kansas, that process required J.L. to complete foster parent training. J.L. had unsupervised telephone visitation with the minors twice

6

per week, though he began to call less frequently in the month before the hearing. The Agency believed that the lack of an ICPC approval prevented the Agency from allowing overnight visitation or placing the minors with J.L., but the Agency was hopeful that ICPC approval would occur during the next review period. The Agency concluded "there is a substantial likelihood that the [minors] could return to [J.L.'s] care by the 12[-]month date."

The Agency reported that Christine had not participated in her required reunification services, which included a domestic violence program, general counseling, psychotropic medication evaluation, parenting education, and substance abuse treatment evaluation and testing. Christine told the Agency that her time was occupied by efforts to get stable housing and employment and to meet her medical needs. Christine's supervised visitation with the minors was only sporadic during the first half of the review period. During the second half, Christine had weekly supervised visitation. The visits were positive overall. The Agency recommended the court continue Christine's reunification services and supervised visitation.

During the hearing, J.L.'s counsel stated he believed that ICPC approval would be forthcoming. J.L.'s counsel said J.L. was "ready, willing, and able to take the children in at this time, [and] recognizes there may be some transition necessary." The court found that Christine had made limited progress with her case plan, while J.L. had made substantial progress. The court continued the minors' custody with the Agency and placement with R.L. The court ordered continued reunification services for Christine. The scheduled 12-month review hearing remained set.

7

In advance of the 12-month review hearing, the Agency reported J.L. had received ICPC approval for the minors. J.L. flew to San Diego twice to visit the minors. At least one visit included J.L.'s wife and their son. The visits went well. The minors also flew to Kansas to visit J.L. and his family. The minors were excited to visit J.L., and they told an Agency social worker that they "very much enjoyed their time" there. When the social worker asked the minors whether they wanted to live with J.L., each said he or she was unsure. The minors did not have a positive or negative response. The minors' court-appointed special advocate (CASA) reported that Liam and Angel were excited about living with J.L., while M.L. expressed mixed emotions. M.L. said she would like to live with J.L. but would miss her grandmother R.L. The CASA believed that placement with J.L. was in the best interests of the minors and recommended placement with him.

Christine and R.L. were opposed to placing the minors with J.L. Christine became upset at the prospect and told the Agency that J.L. was never around for the minors. Christine said, "The father can die! You can put that in your report!" R.L. told the Agency she did not trust J.L. based on his history of alcoholism and his poor relationship with Christine in the past. R.L. was very bonded to the minors and felt that placing them with J.L. was not in their best interests. R.L. reported that the minors told her they did not want to live with J.L.

J.L. told the Agency he believed the minors should be placed with him, but he did not want to force the minors into moving. The Agency stated that it was still assessing placement with J.L. and wanted to schedule a team decisionmaking (TDM) session to

8

discuss the idea with the family. Christine continued to make inadequate progress with her reunification services.

At the TDM session, which was attended by Christine, R.L. and J.L., the family was unable to agree on where the minors should be placed. The family did agree on protocols for visitation and services depending on whether the minors remained in San Diego or moved to Kansas. The Agency reported that the minors' statements about placement were mixed. Their interactions with J.L., however, were unequivocally positive. The Agency believed more time was necessary before it could make a placement recommendation.

Two weeks later, the Agency determined there would be no legal detriment to placing the minors with J.L. in Kansas and recommended placement with him. The Agency wrote, "The father's home has an approved ICPC home study, he is willing and able to take placement of the children, and the children have had positive interactions with him during visits in San Diego as well as in [Kansas]." The Agency reported concerns about R.L.'s care of the minors. The minors had numerous unexcused absences from school, as well as tardies, and the minors had been placed on the list for the School Attendance Review Board (SARB). R.L. did not show up for a pre-SARB meeting, and it had to be rescheduled.

At the 12-month review hearing, the parties announced they had reached a proposed settlement regarding placement. The minors would be placed with J.L. but remain detained in R.L.'s care until the end of the school year. At that point, they would move to Kansas. The court expressed concerns about the parties' agreement, including

R.L.'s apparent inability to ensure regular school attendance and the potential for R.L. to speak negatively about the move to Kansas while the minors remained in her care. The court asked whether it might be best for the minors to start anew in Kansas with a parent who could support them fully.

After discussion, the court decided it could not endorse the proposed settlement. The court stated, "I don't feel comfortable going forward with the settlement. I think it's absolutely imperative that an order for the settlement to be for the benefit of the minors, that the caregiver [R.L.] is 100 percent on board with the parameters of the settlement and understands [¶] . . . [¶] [the] emotional impact that this has on the children. And by not taking ownership of the fact that there is an abysmal record here, in front of me, with regard to the kids' attendance, and lack thereof, at school. I have a very difficult time finding that this settlement is, in sum, in the best interests of the children." The court continued the 12-month review hearing and set a trial on the issue of placement.

At the continued hearing, the court received various Agency reports into evidence, as well as two letters written by M.L. and Jonah. M.L. wrote emphatically that she did not want to go to Kansas and wanted to remain with R.L. Jonah wrote that the minors wanted to stay in R.L.'s care and that he believed R.L.'s home was the best for them. Jonah said the minors were worried about the prospect of moving to Kansas and Angel, in particular, had become depressed and had nightmares.

J.L. testified at the hearing. He said he had a stable union job at a warehouse in Kansas. J.L. acknowledged he had not seen the minors for a while prior to the dependency case. He said he sent Christine multiple e-mails, but every time they talked

10

they argued. J.L. heard about the minors' dependency case from a friend, and that was the first time he had known how to contact the minors. J.L. said he talked to the minors approximately twice a week by telephone, though sometimes he missed calling them because of his work schedule and the time difference between Kansas and California. J.L. said he worked six days a week, but that his wife could care for the minors while he was working. J.L. admitted he drank alcohol heavily while he lived in California. But he testified he has been completely sober for two years.

Christine also testified. She said that J.L. began to abuse her physically, emotionally and verbally when she was pregnant with Liam. J.L. was abusive for the remainder of their relationship. He drank a "vast amount" of alcohol and stayed away from home for a week or two weeks at a time. Christine said J.L. punched, choked and hit her. Christine described three incidents in which J.L. kicked and punched her, one time when she was pregnant. The minors witnessed at least one of the incidents. Christine said there were other incidents of violence as well. Christine said she had attended three domestic violence classes and participated in therapy in connection with the current dependency case. She had not engaged in a substance abuse program or parenting classes.

In rebuttal testimony, J.L. denied abusing Christine. J.L. said her testimony was false. He denied any arrests for incidents of domestic violence and said there had not been any incidents of domestic violence between him and his wife.

Agency reports showed that J.L. had been arrested for driving under the influence three times. The last time was in 2009. J.L. was also arrested in 2001 for conspiracy to

11

commit robbery and assault with a deadly weapon. An Agency social worker testified that J.L. had no criminal history after 2009. The social worker testified that Christine's testimony did not change his recommendation and that he was comfortable placing the minors with J.L.

The court found that J.L. had met the objectives of his case plan: "to develop a positive support system" and "to be nurturing and supportive during visitation with the children." The court stated, "[J.L.] was not required to complete any further services as part of his case plan as he is the nonoffending, noncustodial parent who did choose to defer to [Christine] to give [her] an opportunity, over the last 16 months, to participate in services and reunify with the children." The court found that "return of each of these three children, Liam, [M.L.] and Angel, would not create a substantial risk of detriment to those children. And accordingly, I order that each of those children are placed with [J.L.] I make that finding by clear and convincing evidence." The court further found that "closing the case today would be likely to recreate the conditions that initially caused assumption of jurisdiction. And, therefore, I order that the case remain open, and that family maintenance services be provided to this family." Because Christine had not made substantive progress in her reunification services, the court terminated those services but ordered discretionary family enhancement services for her. Christine appeals.

DISCUSSION

I

We begin with a brief overview of the relevant aspects of California's dependency statutes. "The law's primary concern is the protection of children. [Citation.] The court asserts jurisdiction with respect to a child when one of the statutory prerequisites listed in section 300 has been demonstrated." (*In re I.A.* (2011) 201 Cal.App.4th 1484, 1491; see § 300 ["Any child who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge that person to be a dependent child of the court . . . ."].)

"In all cases in which a minor is adjudged a dependent child of the court on the ground that the minor is a person described by Section 300, the court may limit the control to be exercised over the dependent child by any parent or guardian and shall by its order clearly and specifically set forth all those limitations." (§ 361, subd. (a)(1).) Under certain circumstances, the court may remove the child from the physical custody and care of his or her parent or parents. (§ 361, subd. (c); see *In re A.R.* (2015) 235 Cal.App.4th 1102, 1114-1115.)

When a child is removed from the custodial parent or parents, care and custody of the child is vested with the social services agency, who must physically place the child in a home or care facility.[4] (See § 361.2, subd. (e); see also *In re Austin P.* (2004)

---

[4] "A parent who had physical custody of the child before the child was removed from the home is often referred to as the 'custodial parent.' " (*In re Adrianna P.* (2008) 166 Cal.App.4th 44, 55, fn. 5 (*Adrianna P.*).)

118 Cal.App.4th 1124, 1132.) The governing statutes task the juvenile court with enforcing certain priorities regarding placement. Primary among these statutory priorities is placement with a noncustodial parent (§ 361.2, subd. (a)), who has both statutory and constitutional rights to the care and custody of his or her own child.[5] "A nonoffending parent has a constitutionally protected interest in assuming physical custody, as well as a statutory right to do so, in the absence of clear and convincing evidence that the parent's choices will be detrimental to the safety, protection, or physical or emotional well-being of the child." (*In re A.A.* (2012) 203 Cal.App.4th 597, 605 (*A.A.*); see *In re Abram L.* (2013) 219 Cal.App.4th 452, 461.)

The statute governing the priority of a noncustodial parent to placement and custody of a dependent minor provides as follows: "When a court orders removal of a child pursuant to Section 361, the court shall first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child. If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child." (§ 361.2, subd. (a); see *In re Maya L.* (2014) 232 Cal.App.4th 81, 97 (*Maya L.*).) "To comport with due

---

[5]    "The Legislature and the courts have used the phrase 'noncustodial parent' to refer to a parent described by section 361.2, subdivision (a)." (*Adrianna P., supra*, 166 Cal.App.4th at p. 55, fn. 6.) A mere alleged or biological father does not qualify as a "parent" under this statute; he must obtain presumed father status. (*Zacharia D., supra*, 6 Cal.4th at p. 454.)

process, the detriment finding must be made under the clear and convincing evidence standard." (*In re C.M.* (2014) 232 Cal.App.4th 1394, 1401 (*C.M.*); see *In re Marquis D.* (1995) 38 Cal.App.4th 1813, 1829.)

If the court places the child with the noncustodial parent, the court may terminate its jurisdiction over the child (§ 361.2, subd. (b)(1)), maintain jurisdiction pending a home visit (§ 361.2, subd. (b)(2)), or maintain jurisdiction with court supervision (§ 361.2, subd. (b)(3)). "In enacting subdivisions (a) and (b) of section 361.2, the Legislature envisioned a two-step process: under subdivision (a), the court examines whether it would be detrimental to temporarily place a child with the nonoffending noncustodial parent; under subdivision (b), the court decides whether that placement should become permanent and whether the court's jurisdiction should be terminated. [Citation.] Where the noncustodial parent does not seek custody, there is no need to address any risk that might arise from placement with him or her." (*A.A.*, *supra*, 203 Cal.App.4th at p. 605.) If the court does not place the child with the noncustodial parent, the social worker may place the child in another suitable home or care facility. (§ 361.2, subd. (e)(2)-(9); see *Adrianna P.*, *supra*, 166 Cal.App.4th at p. 55.)

" 'If a child has been declared a dependent of the juvenile court and placed under court supervision, the status of the child must be reviewed every six months.' " (*Maya L.*, *supra*, 232 Cal.App.4th at p. 98.) The custodial parent generally has the opportunity to regain physical custody of the child at each review hearing. (See *Zacharia D.*, *supra*, 6 Cal.4th at pp. 453-454.) "At the review hearing held six months after the initial dispositional hearing . . . the court shall order the return of the child to the physical

15

custody of his or her parent or legal guardian unless the court finds, by a preponderance of the evidence, that the return of the child to his or her parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.21, subd. (e).) Similarly, at the 12- and 18-month hearings, if available, the court must generally determine whether return would be detrimental: "After considering the relevant and admissible evidence, the court shall order the return of the child to the physical custody of his or her parent or legal guardian unless the court finds, by a preponderance of the evidence, that the return of the child to his or her parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.21, subd. (f); see § 366.22, subd. (a).)

## II

In this appeal, Christine contends the juvenile court erred by placing the minors with J.L. at the 12-month review hearing. Christine assumes that section 361.2, subdivision (a) applies and argues that substantial evidence did not support the court's finding that it would not be detrimental to the minors to place them with J.L. The Agency points us to *Zacharia D.*, in which our Supreme Court held that section 361.2, subdivision (a) does not apply when a noncustodial parent requests custody after disposition. The Agency argues the statute nonetheless applies here and urges us to affirm the juvenile court's placement order. J.L. joins in the Agency's position.

Our Supreme Court has indicated that, by its express terms, section 361.2, subdivision (a) applies only when the minor is first removed from the custodial parent,

16

generally at the time of the disposition hearing: "Nothing in this statute suggests that custody must be immediately awarded to a noncustodial parent regardless of when in the dependency process the parent comes forward. Rather, its language suggests that the statute is applicable only at the time the child is first removed from the custodial parent or guardian's home." (*Zacharia D.*, *supra*, 6 Cal.4th at p. 453; see § 361.2, subd. (a) ["*When a court orders removal of a child pursuant to Section 361*, the court shall first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child." (Italics added.)].)

In *Zacharia D.*, the Supreme Court considered whether a noncustodial, biological father who appears late in dependency proceedings may request placement under section 361.2, subdivision (a). The biological father in that case appeared several months prior to the minors' 18-month review hearing but did not achieve presumed father status. (*Zacharia D.*, *supra*, 6 Cal.4th at p. 441.) As such, the Supreme Court found that section 361.2, subdivision (a) was inapplicable for two reasons: (1) the statute only applied at disposition, which had occurred more than a year earlier; and (2) the statute does not apply to a mere biological father. (*Zacharia D.,* at pp. 453-454.)

Despite the statute's plain language and our Supreme Court's admonition that the statute applies only at disposition, the Agency points out that several courts considering a noncustodial parent's request for custody after the disposition hearing have applied section 361.2, subdivision (a). (See *In re Jonathan P.* (2014) 226 Cal.App.4th 1240 (*Jonathan P.*); *In re Suhey G.* (2013) 221 Cal.App.4th 732 (*Suhey G.*).) In these cases,

17

however, the noncustodial parent appeared for the first time after disposition, often because the social services agency failed to adequately search for the parent. (*Jonathan P.*, at p. 1255 ["[I]t is of great concern that a nonoffending parent, who has cooperated with the court and the Department throughout the proceedings, and who appeared in the proceedings as soon as he learned of them, has been deprived of custody without any court ever finding that placement with him would be detrimental to the minor."]; *Suhey G.*, at pp. 744-745 ["The Department's failure to properly serve father deprived him of the opportunity to appear at the disposition hearing and obtain custody under the section 361.2 framework."].)

Here, J.L. contacted the Agency prior to disposition and was represented at the disposition hearing. J.L. did not request custody at that time. Instead, he understandably worked with the Agency to develop a relationship with the minors prior to requesting custody. By the time J.L. did request custody, the disposition hearing had already passed. *Jonathan P.* and *Suhey G.* are therefore factually inapposite and provide no basis to apply section 361.2, subdivision (a) under the circumstances here.[6]

---

[6]     *Janee W.*, also cited by the Agency, does not aid in our consideration of this issue. In that case, the dependent child had already been placed with the noncustodial parent. (*Janee W.*, *supra*, 140 Cal.App.4th at pp. 1448, 1450.) The issue in *Janee W.* was which standard of review to apply at subsequent review hearings to determine whether continuing dependency jurisdiction was necessary. (*Id.* at p. 1450.) *Janee W.* determined that section 361.2, subdivision (b) rather than section 364, provided the applicable standard since the child was placed with the noncustodial parent. (*Janee W.*, at pp. 1450-1451.) The standard for initial placement with a noncustodial parent was not at issue.

    Similarly, the California Rules of Court do not shed light on the situation at issue here. "If the court has previously placed or at this hearing places the child with a noncustodial parent, the court must follow the procedures in rule 5.708(k) and

A noncustodial parent's remedy under the circumstances here is to seek modification of the juvenile court's disposition order under section 388.[7] (*In re Z.K.* (2011) 201 Cal.App.4th 51, 71 (*Z.K.*).) In *Z.K.*, the court recognized that "[s]ection 361.2 is designed to apply at the disposition phase of the dependency proceeding, when the court first elects to remove the child from the custody of the custodial parent. It does *not*—at least, not in the course of an ordinary dependency case—apply at the [section] 366.26 hearing." (*Id*. at p. 70.) However, *Z.K.* determined that a noncustodial parent may raise the issue of placement through a section 388 modification petition: "The issue of a return to parental custody *can* be raised late in the dependency proceeding, however, by means of a section 388 petition to change, modify, or set aside a previous order based on a change in circumstances or new evidence." (*Id*. at p. 71.) The relevant change in circumstances or new facts may be, for example, the noncustodial parent's late appearance in the action and request for custody or, as here, the parent's positive

___

section 361.2." (Cal. Rules Ct., rule 5.710(b)(2); see *id.*, rules 5.715(b)(3) & 5.720(b)(2).) This rule, and its analogs, allow for the possibility of placement with a noncustodial parent and, like *Janee W*., mandate that the postplacement procedures of section 361.2 must be followed. (Cal. Rules of Ct., rule 5.708(k), cited in these rules, contains similar postplacement procedures.) The rules do not provide the procedural mechanism or standard courts must apply to a placement request by a noncustodial parent after disposition. (See *Jonathan P*., *supra*, 226 Cal.App.4th at p. 1254, fn. 11; see also *Suhey G.*, *supra*, 221 Cal.App.4th at p. 743, fn. 22.)

7    Section 388 provides in relevant part as follows: "Any parent or other person having an interest in a child who is a dependent child of the juvenile court . . . may, upon grounds of change of circumstance or new evidence, petition the court . . . for a hearing to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court." (§ 388, subd. (a)(1).)

19

participation in the dependency case (during which he developed a relationship with the minors) and subsequent request for custody.

In *Zacharia D.*, our Supreme Court appears to have endorsed the use of a section 388 petition in this context. Although the Supreme Court was considering the custody request of a biological father, not a presumed father, its reasoning is instructive: "While a biological father is not entitled to custody under section 361.2, or reunification services under section 361.5 if he does not attain presumed father status prior to the termination of any reunification period, he may move under section 388 for a hearing to reconsider the juvenile court's earlier rulings based on new evidence or changed circumstances." (*Zacharia D.*, *supra*, 6 Cal.4th at p. 454.)

Normally, the party invoking section 388 must show the requested change is in the best interests of the dependent child: "The juvenile court may modify an order if a parent shows, by a preponderance of the evidence, changed circumstances or new evidence and that the modification would promote the best interest of the child." (*In re Aaliyah R.* (2006) 136 Cal.App.4th 437, 446.) One court has expressed concern that this standard conflicts with a noncustodial parent's constitutional right to the care and custody of his or her child. (See *Jonathan P.*, *supra*, 226 Cal.App.4th at p. 1256.) *Jonathan P.* explained its reasoning as follows: "The 'finding of detriment standard' and the 'best interest standard' are not legal equivalents. In general, under the detriment standard, it is not the nonoffending parent's burden to show that she is capable of caring for her child. Instead, the party who is opposing placement has the burden to show by clear and convincing evidence that the child will be harmed if the nonoffending parent is given custody. In

20

contrast, under the section 388 'best interest standard,' the parent seeking to modify the placement order shoulders the burden to prove both a change in circumstances and that the modification would be in the best interest of the minor." (*Ibid.*)

While *Jonathan P.*'s assessment of the two standards is correct as a general matter, the standards are not so distinct in the context of a noncustodial parent's request for custody of his or her dependent child postdisposition. (See, e.g., *Zacharia D.*, *supra*, 6 Cal.4th at p. 456 [finding of detriment would have led to finding that placement was not in minors' best interests].) As one court noted in another context, "The two standards are basically two sides of the same coin. What is in the best interests of the child is essentially the same as that which is not detrimental to the child." (*In re Randalynne G.* (2002) 97 Cal.App.4th 1156, 1169.)

This conclusion is compelled by the policies underlying California's dependency scheme. An underlying presumption reflected in this scheme is that a child should be placed with his or her parents, whether custodial or noncustodial, and that such placement is in the child's best interests absent a finding of detriment. "The Legislature has defined the best interests of children in dependency proceedings along a statutory continuum. Family preservation, with the attendant reunification plan and reunification services, is the first priority when child dependency proceedings are commenced. [Citation.] Reunification services implement 'the law's strong preference for maintaining the family relationships if at all possible.' [Citation.] 'To achieve the goal of preserving the family whenever possible, the Legislature required the county child welfare departments to develop and implement family reunification plans and required the courts to monitor

21

those plans through periodic review.  Family reunification efforts are required to begin with the first determination the child will be detained in juvenile court custody.' " (*In re Elizabeth R.* (1995) 35 Cal.App.4th 1774, 1787.)  "[T]he presumption for placement with a noncustodial parent at a disposition hearing is consistent with the statutory scheme as a whole, and furthers the legislative goals to maintain or place a child in the care of a parent when safe for the child, strengthen the child's relationship with siblings and other relatives, and avoid the child's placement in foster care." (*In re Nickolas T.* (2013) 217 Cal.App.4th 1492, 1505-1506.)

A noncustodial parent therefore makes a prima facie case of best interests, under section 388, when the noncustodial parent requests custody of the dependent child postdisposition.  This minimal burden reflects the noncustodial parent's constitutional right to care and custody of the child and the law's presumption that the child should be placed with his or her parents whenever possible.  A court considering the noncustodial parent's petition must place the child with the noncustodial parent unless the opposing party establishes that the placement would be detrimental to the child's safety, protection, or physical or emotional well-being.  (See § 361.2, subd. (a); see also *Z.K.*, *supra*, 201 Cal.App.4th at p. 72.)  In this context, a finding of detriment is equivalent to a finding that placing the dependent child with the noncustodial parent is not in the child's best interests.  "A detriment evaluation requires that the court weigh all relevant factors to determine if the child will suffer net harm."  (*In re Luke M.* (2003) 107 Cal.App.4th 1412, 1425 (*Luke M.*).)  "[W]here a child has a fit parent who is willing to assume custody, there is no need for state involvement unless placement with that parent would create a

22

substantial right of detriment to the child.  [Citation.]  When the parent is competent, the standard of detriment is very high."  (*In re Patrick S.* (2013) 218 Cal.App.4th 1254, 1263 (*Patrick S.*).)  As we have noted, however, we expressly do not consider whether the presumption that placement with the noncustodial parent would be in the minors' best interests (and resulting analysis) would still be applicable if the noncustodial parent participates in reunification services, the parent fails to make substantial progress, the court terminates those services, and the court sets a selection and implementation hearing under section 366.26.  (See generally *In re Marilyn H.* (1993) 5 Cal.4th 295, 308-309; see also *Z.K.*, *supra*, 201 Cal.App.4th at pp. 65-66, 70-71.)

Here, J.L. did not file a section 388 petition.  For reasons we will explain, however, we conclude this omission was harmless.  (See *Z.K.*, *supra*, 201 Cal.App.4th at p. 71 [finding omission harmless]; see also *Zacharia D.*, *supra*, 6 Cal.4th at p. 455.)  The parties appear to have assumed the court had authority to place the minors with J.L., and the parties' settlement agreement proposed that the minors be placed with him.  When the court did not approve the parties' settlement agreement, the Agency recommended placement with J.L. and the court held a contested trial on the issue of placement.  The parties had the opportunity to offer evidence regarding that placement, and Christine did so.  The substance of the issue was therefore before the juvenile court, and no party objected that J.L. had not filed a section 388 petition.  In effect, all parties consented to the juvenile court's consideration of the merits of placement with J.L. and impliedly waived any procedural defect in the court's consideration of the issue.  (See *Z.K.*, at p. 71.)  On the merits, the juvenile court assessed the issue of placement and found no

23

detriment. Formally filing a petition under section 388 would have had no effect on the juvenile court's decision. We therefore turn to the substance of Christine's contention that the court erred by finding no detriment to placing the minors with J.L.

III

Christine argues that the evidence does not support the juvenile court's finding that placing the minors with J.L. would not be detrimental. As we explained in the previous part, once the noncustodial parent has requested custody, and thus made a prima facie showing of best interests, the party opposing placement must show that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child.

We review the juvenile court's finding that the minors would not suffer detriment for substantial evidence. (See *Luke M.*, *supra*, 107 Cal.App.4th at p. 1426.) "The issue of sufficiency of the evidence in dependency cases is governed by the same rules that apply to other appeals. If there is substantial evidence to support the findings of the juvenile court, we uphold those findings. [Citation.] We do not evaluate the credibility of witnesses, reweigh the evidence, or resolve evidentiary conflicts. Rather, we draw all reasonable inferences in support of the findings, consider the record most favorably to the juvenile court's order, and affirm the order if supported by substantial evidence even if other evidence supports a contrary conclusion. [Citation.] The appellant has the burden of showing the finding or order is not supported by substantial evidence." (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947 (*L.Y.L.*).)

Here, the evidence supports the juvenile court's finding that placement with J.L. would not be detrimental to the minors.  The juvenile court could reasonably find that J.L. was an able and loving father with a stable job and home life.  He cooperated with the Agency and developed a positive relationship with the minors during the dependency case.  The evidence supports the conclusion that the minors enjoyed visiting with J.L., both in San Diego and Kansas, and exhibited no distress from being away from R.L. or Jonah.  The Agency reported that the minors had neither a positive nor negative feeling toward moving to Kansas.  The minors' CASA reported that Liam and Angel were excited about living with J.L., while only M.L. expressed mixed emotions.  J.L. had an approved ICPC application in Kansas, which required completion of foster parent training.[8]  He had no history of child abuse or neglect.  While J.L. had a criminal history, most of his arrests were alcohol related and he had apparently resolved his alcohol addiction since moving to Kansas.  J.L. had no arrests since 2009.  We note that the minors had encountered problems, including school attendance issues, in their current placement with R.L.  After considering the minors' situation, the CASA believed that placement with J.L. was in their best interests.  The Agency social worker responsible for the minors did not see any detriment and recommended placement with J.L. as well.  This evidence provides sufficient support for the juvenile court's finding that placement with J.L. would not be detrimental.  (See *Patrick S.*, *supra*, 218 Cal.App.4th at p. 1263.)

---

[8]    Although the Agency apparently required J.L. to obtain an ICPC approval, "[c]ompliance with ICPC is not required for placement with an out-of-state parent." (*Patrick S.*, *supra*, 218 Cal.App.4th at p. 1264.)

25

Christine contends the court erred by not finding detriment because (1) the minors were bonded to their current caregiver, maternal grandmother R.L., and their brother Jonah; (2) the minors had never lived with J.L., had no contact with him for several years, and did not have a strong bond to him; and (3) the minors expressed their wishes not to be placed with J.L. At most, however, Christine has arguably identified evidence from which the court could have found detriment. Christine invites us to reweigh the evidence of detriment, which is inconsistent with our standard of review. (See *L.Y.L.*, *supra*, 101 Cal.App.4th at p. 947 ["We do not evaluate the credibility of witnesses, reweigh the evidence, or resolve evidentiary conflicts."]; see also *In re Stephanie M.* (1994) 7 Cal.4th 295, 318 [" 'When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.' "].)

Indeed, none of the factors cited by Christine are determinative: "While the child's wishes, sibling bonds and the child's relationship with the noncustodial parent may be considered by the juvenile court in determining whether placement of a dependent child with a noncustodial, nonoffending parent would be detrimental to the child's physical or emotional well-being, none of these factors is determinative." (*C.M.*, *supra*, 232 Cal.App.4th at p. 1402.) The juvenile court here considered all of the evidence, including the evidence cited by Christine, and found no detriment from placement with J.L. For the reasons we have explained, the evidence supported the juvenile court's finding. (*Id.* at p. 1403 ["[N]either [the minors'] understandable wish to remain with the maternal grandparents in the only home she had ever known, nor the alleged lack of an

26

established relationship with father, was sufficient to constitute substantial evidence of the high level of detriment required under section 361.2 [, subdivision] (a)."].)

Christine relies on *Luke M*., in which this court affirmed a finding of detriment under section 361.2. In that case, this court considered whether substantial evidence supported the juvenile court's finding that "if [the minors] were forced to move to Ohio, they would suffer emotional detriment as a result of their separation from their siblings." (*Luke M.*, *supra*, 107 Cal.App.4th at p. 1425.) The evidence showed that the minors "depended on their siblings for love, support, and security. . . . They cried and became depressed when [the social worker] spoke with them about the possibility of separating." (*Id.* at p. 1426.) One minor was "extremely bonded" to her sister. (*Ibid.*) After visiting Ohio, the minors "said they wanted to live in California." (*Ibid.*) Significantly, "the social worker opined the children would suffer detriment if separated from their siblings." (*Ibid.*) The social worker did not believe telephone calls, visits, or therapy would address the minors' concerns. (*Id.* at p. 1427.) When one minor became "very upset" while testifying, the juvenile court "commented that the record would not come 'close to revealing the depth of that young man's reaction to the prospect of being separated.' " (*Ibid.*) This court affirmed the juvenile court's order denying placement in Ohio, holding that "[t]he record amply supports a finding that there was a high probability that moving to Ohio would have a devastating emotional impact on [the minors]." (*Id.* at p. 1426.)

*Luke M*. does not support Christine's position. *Luke M*. considered whether substantial evidence supported the juvenile court's finding of detriment. (*Luke M.*, *supra*, 107 Cal.App.4th at p. 1424.) The issue here is the opposite: whether substantial

27

evidence supports the juvenile court's finding of no detriment. Moreover, the facts here are readily distinguishable from *Luke M*. In contrast to the testimony and statements of the minors in that case, which were uniformly negative, the minors here appeared to have mixed (and some positive) feelings regarding the prospect of living in Kansas. M.L. wrote a letter to the court describing her bonds with R.L. and Jonah and expressing her desire to live in California. Jonah similarly described his bond with his siblings and their bonds with their grandmother. But, in light of all the evidence, the juvenile court could reasonably determine this was not evidence of detriment. (See *In re John M*. (2006) 141 Cal.App.4th 1564, 1570; see also *Patrick S.*, *supra*, 218 Cal.App.4th at p. 1265 ["[A] child's preference is not the deciding factor in a placement decision . . . ."].) Significantly, unlike *Luke M*., the Agency social worker here recommended placement with J.L. after reviewing all of the evidence. The juvenile court could reasonably agree with that assessment.

## DISPOSITION

The order is affirmed.

IRION, J.

WE CONCUR:

NARES, Acting P. J.

O'ROURKE, J.