Filed 1/19/22  In re Matthew B. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re MATTHEW B. et al., Persons Coming Under the Juvenile Court Law. | |
| STANISLAUS COUNTY COMMUNITY SERVICES AGENCY,  Plaintiff and Respondent,  v.  C.S.,  Defendant and Appellant. | F083035  (Super. Ct. Nos. JVDP-20-000179, JVDP-20-000180 & JVDP-20-000181)  **OPINION** |

## THE COURT[*]

APPEAL from an order of the Superior Court of Stanislaus County.  Ann Q. Ameral, Judge.

Konrad S. Lee, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Boze, County Counsel, and Sophia Ahmad, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

---

[*]        Before Franson, Acting P. J., Peña, J. and DeSantos, J.

Dependency jurisdiction was taken over mother C.S.'s four children, then 15-year-old Matthew B., then 11-year-old M.B., then two-year-old M.S.,[1] and then nine-month-old Joshua S. (Welf. & Inst. Code,[2] § 300, subd. (b)(1)). At the time of the disposition hearing, mother was incarcerated, and the court declined to order reunification services based on its finding such services would be detrimental to the children pursuant to section 361.5, subdivision (e)(1).[3] A six-month review hearing was set, as Joshua's father was granted reunification services, and Matthew and M.B.'s father's whereabouts were then unknown. Prior to the hearing, the Stanislaus County Community Services Agency (agency) recommended that a section 366.26 hearing be set for Matthew and M.B. and that reunification services be continued as to Joshua's father. Mother filed a section 388 petition prior to the hearing requesting the court order her to be provided with reunification services and that the children be returned to her. The court conducted a hearing to determine whether mother had made the requisite showing affording her an evidentiary hearing on her petition. Following the hearing, the court denied mother's petition without holding an evidentiary hearing. On appeal, mother contends the court erred by summarily denying her petition, as to Joshua only. Finding no error, we affirm.

## FACTUAL AND PROCEDURAL SUMMARY

On or about August 29, 2020, law enforcement stopped mother for driving with Joshua and M.S. without having them secured in car seats. As a result, mother arranged for her friend to care for the children. Upon driving mother back to her residence,

---

[1] At the dispositional hearing, a section 366.26 hearing was set for M.S., putting M.S. on a different procedural trajectory to the other children. M.S. is not a subject of this appeal.

[2] Further undesignated statutory references are to the Welfare and Institutions Code.

[3] Section 361.5, subdivision (e)(1) provides that when a parent is incarcerated, the juvenile court "shall order reasonable services unless the court determines, by clear and convincing evidence, those services would be detrimental to the child."

2.

mother's friend observed the front door of the residence was open, old food on the floor, spoiled milk, dirty diapers with feces in the bathroom sink within reach of M.S., minimal food, and a strong odor. Mother's friend also observed mother was acting strangely and may have been under the influence of methamphetamine. The friend reported to law enforcement the condition of the home. Law enforcement subsequently made a referral to the agency based on their observations of the condition of the home and that mother appeared to be under the influence of "something."

Two days later, the emergency response social worker visited mother's home and observed it to be clean with no visible hazardous conditions, though the couch was on the public sidewalk outside of the home, and mother had abrasions on her forehead, open wounds on her lips, and severe bruising near both of her calves. The social worker observed that mother appeared to be under the influence of methamphetamine based on her observations that mother had an "inability to stay on topic, mood swings, paranoia, erratic behaviors, and disheveled appearance" and made unconnected and tangential statements. The social worker also believed that mother seemed to be more concerned about the cost of her traffic ticket than with the safety of the children. Mother stated her ticket was for "erratic and loopy driving" and justified not having car seats for the children because they were "dirty." Mother told the social worker she was injured because she had been in a car accident while under the influence of Vicodin.

Mother reported she was not taking medication for any mental health diagnosis but had previously reported during past child welfare referrals she had been diagnosed with posttraumatic stress disorder (PTSD), depression, and anxiety. Mother agreed to drug test, but after 10 minutes, stated she could not urinate because of her car accident and did not agree to take a hair follicle test. Mother called the maternal grandfather, who subsequently arrived at the residence and agreed to be interviewed.

The maternal grandfather told the social worker he was concerned about the children being in mother's care and suspected she was using drugs again. He reported

3.

mother does well for short periods of time but then goes back to her "old ways," which he described as drug use, bad choices in men, and poor decision-making. A few days prior, he had given mother supplies, which she in turn sold for "dope," and she was unable to hold a coherent conversation with him. He stated that mother self-medicated with methamphetamine and did not take her bipolar medication.

Mother did not sign the safety plan the social worker created, which stated the children would stay with her friend until the Team Decision Making (TDM) meeting, but did agree to participate in the TDM meeting.

The social worker visited the home of Joshua's older half siblings, Matthew and M.B., where they lived with a relative caregiver. Matthew and M.B. were in a legal guardianship with the maternal grandfather from 2016 to mid-2019, and had been in their current home for approximately a month and a half. Matthew and M.B. reported negative feelings toward mother. Matthew reported mother would not "recover" and M.B. reported mother was "better off homeless" because she took advantage of the home where she lived. M.B. expressed she wanted a stay away order from mother. Matthew reported not feeling safe unless the agency removed them from mother's care.

At the TDM meeting on September 1, 2020, it was observed that mother lacked insight and minimized the agency's safety concerns. Mother "presented with an inability to emotionally regulate and continued to interrupt, had labile mood swings, and did not sound entirely coherent throughout the meeting." Mother also blurted out random statements and appeared to be having conversations with herself. The social worker noted it was "difficult to have a meaningful discussion regarding the safety of her children."

Later that day, the social worker spoke with Joshua's father who expressed he wanted to be part of Joshua's life. He reported mother had told him a few days prior that she had relapsed on methamphetamine. He further reported mother had told him two to

three months prior that she had crushed an adult melatonin pill, dissolved it in water, and forced Joshua to drink it because he was not sleeping.

The children were placed into protective custody. When the social worker served mother with the warrant, she blamed Joshua's father for the removal and "displayed irregular, emotional mood swings, a flat affect, and disconnected [*sic*]." Joshua and M.S. were placed in foster care, and Matthew and M.B. were to stay with their relative caregiver.

Mother had a history of child welfare referrals dating back to 2010. In December 2010, a mandated reporting party reported that Matthew, then five years old, was wandering around an apartment complex at night with no shoes in 54 degree weather. Law enforcement was dispatched and eventually mother arrived at the apartment; she stated she had gone out to get food for Matthew because he "had been giving her trouble," but the officer smelled alcohol on her breath and observed she had tall cans of beer and a pack of cigarettes in a brown paper bag. The maternal grandfather told law enforcement he would stay with her that night though the referral for general neglect was substantiated.

In April 2016, mother told a mandated reporting party that she was prostituting herself out of her home, at times with her children present. Mother reported that she screened the men, and they were safe. Mother also reported hearing voices. When the agency investigated the referral, mother "appear[ed] to flip in and out of different personalities" during the conversation and reported "people take care of her and not everybody can see them." The referral was evaluated out.

In April 2017, the agency received a referral from a mandated reporting party reporting that mother was schizophrenic and off medication. Mother was observed digging in the trash and yelling, saying she was going to be evicted. The referral for general neglect was substantiated.

In May 2017, M.B., then eight years old, reported mother forced her to "smoke from a tube and ball at the end" and was exposed to mother doing "sexual stuff." M.B. reported mother "forced" her and Matthew to run away three times. The referral for general neglect was substantiated.

In March 2018, a mandated reporting party reported that Matthew disclosed when he was about 11 years old, mother would "drug" him to make him very sleepy and "make him have sex with prostitutes." The referral was substantiated for general neglect and deemed inconclusive for exploitation.

In September 2018, a mandated reporting party reported mother had just given birth to M.S. and "hospital staff [were] having issues with [mother] due to her erratic behavior." Mother initially did not allow anyone to touch the baby until after having several conversations with hospital social workers. It was reported that mother was noncompliant with her bipolar medication. It was further reported mother tested positive for methamphetamine, heroin, and THC during early prenatal care but went into rehab and tested negative at delivery. The referral for general neglect was deemed inconclusive.

In December 2018, mother was detained by the police for active warrants for robbery and stolen property. A petition was filed alleging then three-month-old M.S. came within the juvenile court's jurisdiction under section 300, subdivisions (b)(1) (failure to protect) and (g) (no provision for support) due to mother's substance abuse history, mental health issues, and the arrest for outstanding warrants that left M.S. without a caregiver. Mother was granted reunification services, successfully reunified with M.S., and dependency was dismissed with sole legal and physical custody being awarded to mother.

In June 2020, a mandated reporting party reported then 11-year-old M.B. called them because mother had kicked her out of the car, and she was stuck by herself. M.B. had to call her grandfather to pick her up. M.B. reported earlier in the day mother tried to

get her to strip for her dad's friend because they needed money, but she would not do it. M.B. was so upset that the mandated reporting party called 911 so an officer could go check on her. The referral was substantiated for general neglect and deemed inconclusive for exploitation.

Mother had a criminal history dating back to 2000, including various misdemeanor offenses such as drug possession, driving under the influence, petty theft, and elder cruelty.

On September 3, 2020, the agency filed a petition on behalf of Joshua, Matthew, M.B., and M.S., contending they came within the juvenile court's jurisdiction under section 300, subdivision (b)(1) (failure to protect). It was alleged the children had suffered or were at substantial risk of suffering serious physical harm or illness resulting from mother's inability to protect them due to substance abuse issues, mental health issues, domestic violence issues with Joshua's father, and failure to provide an appropriate home. As to Joshua, Matthew, and M.B., it was further alleged they came within the juvenile court's jurisdiction under section 300, subdivision (j) (abuse of sibling) based on mother's previous dependency case involving M.S.

At the detention hearing on September 4, 2020, the juvenile court ordered the children detained from mother. That day, the social worker provided mother with referrals for parenting, individual counseling, and clinical assessments for mental health and medication and substance use disorders.

The agency's combined jurisdictional/dispositional report contained a social history of mother that was conducted in January 2019. Mother reported first using methamphetamine when she was 17 years old. She had previously undergone a mental health assessment, and the clinician informed her she had PTSD and bipolar disorder that may be substance induced. Mother further reported she was prescribed medication for depression through another clinician.

7.

After the detention hearing, mother did not attempt to engage in the referred services and did not schedule visitation with the children. On October 1, 2020, mother was arrested and placed into custody. Mother had reportedly prevented a neighbor from leaving her home for a period of six hours, during which she threw things at him and struck him with a broom on the head approximately 12 times. She also reportedly damaged plants in the neighbor's front yard. Mother was charged with assault with a deadly weapon, false imprisonment, elder abuse, and vandalism.

M.S. and Joshua had been initially placed with the same caregivers M.S. lived with during his previous dependency case, and the caregivers noticed a marked difference in M.S. The caregivers reported M.S. shook when his diaper was changed, panicked when adult males were near or when anyone left the room, and frequently flinched. The social worker also noticed a difference in M.S. The social worker observed both M.S. and Joshua cried when they were looked at or if they looked at the social worker. Matthew and M.B. reported they were happy with their current caregivers and continued expressing negative feelings toward mother. Before the combined jurisdictional/ dispositional hearing, Joshua and M.S. were placed together with Matthew and M.B. with their relative caregivers.

The combined contested jurisdictional/dispositional hearing was conducted on November 19, 2020. The juvenile court found the petition true and adjudged the children dependents of the court. Joshua's father was ordered to receive reunification services, and mother was denied services because the court concluded that mother receiving services would be detrimental to the children pursuant to section 361.5, subdivision (e)(1). In support of its conclusion, the court noted Matthew and M.B. did not want a relationship with mother and that none of the children appeared to have a strong bond with her. The court further noted the length of mother's sentence was unknown and the nature of the charges were concerning. The court went on to say there did not appear to be any detriment to the children if services were not offered to mother as Joshua and

M.S., based on their actions, appeared to have been "severely traumatized" and the older children did not want to see mother. Finally, the court stated there had been no evidence shown that providing reunification services to mother would be in the children's best interest. At the time of the hearing, Matthew and M.B.'s father's whereabouts were unknown. As for M.S., the court set a section 366.26 hearing.

Mother appealed the dispositional order denying her services arguing that, as a matter of law, the bypass provision of section 361.5, subdivision (e)(1) did not apply to her because she had not been convicted of a crime. In *In re Joshua S.* (June 14, 2021, F082100) [2021 Cal.App.Unpub. LEXIS 3854, review denied Sept. 29, 2021, S269868], this court affirmed the judgment, finding section 361.5, subdivision (e)(1) did not exclude parents who had not been convicted but were incarcerated awaiting trial.

The agency's six-month status review report dated April 28, 2021, indicated the children were all doing well in their placement. The care provider wished to adopt Matthew and M.B. and Joshua as well, if he were unable to reunify with his father. Joshua's father was actively participating in and making progress with his reunification services. The social worker recommended that Matthew and M.B. continue as dependents of the court with a permanent plan of adoption with their current caregivers and to set a section 366.26 hearing. As to Joshua, it was recommended that his father's reunification services be continued and the court grant the agency discretion to begin overnight visits that may lead to a trial visit. The six-month review hearing was originally scheduled for May 10, 2021, but was continued a number of times because Matthew and M.B.'s father had been located and needed time to discuss matters with his attorney.

On June 10, 2021, mother filed a section 388 petition requesting the court to "reinstate reunification services and return the children to [her] care." Mother alleged she had been released from custody, had returned to her two-bedroom duplex where she resided alone, had been free from methamphetamine for eight months, attended regular

AA/NA meetings, and had sufficient income to care for the children. She alleged the order was in the best interest of the children because: "These children are still in [reunification] with their fathers with a goal of return[ing] home. Having a mother to share custody, co-parent and share in the upbringing is best for any child." The court ordered a hearing on whether it should grant or deny an evidentiary hearing on the petition.

The hearing on whether to grant an evidentiary hearing on mother's petition was held on June 28, 2021, which was also the date set for the six-month review pretrial hearing. M.B., who was present at the hearing, told the court she did not want to reunify with mother because she did not "want to have to go through another relapse with her." She went on to say that she and Matthew did not want to get hurt again by going through another dependency case and risk not being able to get placed with their current care providers or be split up. She concluded by saying, "That is not a risk me and my brother want to take."

Mother's counsel argued that because the recommendation was for Joshua's father to receive six more months of services, there was "no reason not to" give services to mother as well. Mother's counsel stated mother was actively working on recovery and participating in services. He argued it was in Joshua's best interest because the "only reason" she was not granted reunification services was because she was incarcerated and she has since been released. Mother's counsel similarly argued that if the court were to order Matthew and M.B.'s father[4] to be provided reunification services, she should be provided with them as well.

The juvenile court denied an evidentiary hearing on mother's petition, concluding mother's request was not in the children's best interests. In so ruling, the court stated, as

---

[4]     Matthew and M.B.'s father was not requesting reunification services, only visitation.

10.

for Matthew and M.B.: "I don't see where reinstating reunification services or return of custody of Matthew or M[.B.] to the care of [] mother would be in the children's best interest. They have been clear that they do not wish to return home because they have been, I think, disappointed too many times, and I don't see that it is in their best interest to require them to wait for permanency when there is someone who is willing to adopt them and they wish to be adopted." As for Joshua, the court stated: "[S]ervices certainly can be limited to a period of six months. Given the posture of this case, [Joshua] doesn't really have a relationship with [] mother and he has been in care since September 1st of 2020, so going on nine months already, which is almost half of his little life."[5]

Mother appealed the court's denial of her section 388 petition as to Joshua.

### DISCUSSION

Mother contends the court erred by denying her section 388 petition without holding an evidentiary hearing as to Joshua. We disagree.

A parent petitioning the court to modify a prior dependency order pursuant to section 388 must show the existence of changed circumstances or new evidence and that the proposed change is in the best interest of the child. (§ 388; *In re Stephanie M.* (1994) 7 Cal.4th 295, 317.) A parent need only make a prima facie showing of these elements to trigger the right to a hearing, and courts must liberally construe a section 388 petition in favor of its sufficiency. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309–310.) "However, if the liberally construed allegations of the petition do not make a prima facie showing of changed circumstances and that the proposed change would promote the best interests of the child, the court need not order a hearing on the petition. [Citations.] The prima facie requirement is not met unless the facts alleged, if supported by evidence given credit at the hearing, would sustain a favorable decision on the petition." (*In re Zachary G.* (1999)

---

**5** At the six-month review hearing held on July 9, 2021, as to Matthew and M.B., the juvenile court set a section 366.26 hearing, and as to Joshua, continued reunification services for Joshua's father and set a 12-month review hearing.

77 Cal.App.4th 799, 806.)  In determining whether the petition makes the necessary showing, the court may consider the entire factual and procedural history of the case. (*In re Jackson W.* (2010) 184 Cal.App.4th 247, 258.)

We review the juvenile court's summary denial of mother's section 388 petition for abuse of discretion.  (*In re C.J.W.* (2007) 157 Cal.App.4th 1075, 1079.)  The denial must be upheld unless we can determine from the record that the juvenile court's decision "exceeded the bounds of reason by making an arbitrary, capricious or patently absurd determination."  (*In re Marcelo B.* (2012) 209 Cal.App.4th 635, 642.)  When two or more inferences can reasonably be deduced from the facts, we have no authority to substitute our decision for that of the juvenile court.  (*In re Brittany K.* (2005) 127 Cal.App.4th 1497, 1505.)

Here, mother alleged circumstances had changed in that she:  (1) had been released from custody; (2) had returned to her duplex and resided alone; (3) had been free from methamphetamine use for eight months; (4) attended "regular AA/NA meetings"; and (5) had "sufficient income to care for" the children.  As for how the order was in the children's best interests, she alleged:  "These children are still in [reunification] with their fathers with a goal of return[ing] home.  Having a mother to share custody, co-parent and share in the upbringing is best for any child."

Mother contends these facts constituted a prima facie showing sufficient to trigger an evidentiary hearing on her petition as to Joshua.  In particular, she argues the facts that she had been methamphetamine-free for eight months, was attending AA/NA meetings, and had been released from custody were sufficient because the reason her children were initially removed was her "drug use" and she was denied reunification services because she was incarcerated with an unknown release date.  As a threshold matter, mother's characterization of the reason for the children's removal and the reason she was denied reunification services is an over-simplification of the record and ignores pertinent facts.

12.

The record, read in its totality, demonstrates the children were removed from mother's care not simply for "drug use," as she suggests, but for longstanding substance abuse which put the children at risk of physical harm. The record also demonstrates several other reasons for removal, including mental health issues, domestic violence issues, home safety issues, as well as a general disregard for the children's safety as evidenced in part by her failure to secure the children in car seats and subsequent ambivalence about the failure. Mother's assertion she was denied reunification services only because she was incarcerated is similarly not entirely accurate. Mother's incarceration simply triggered the court's consideration of whether services would be detrimental to the children. The court ultimately denied services to mother based on its finding the services would be detrimental to them, a finding mother notably did not challenge on appeal for sufficiency of the evidence.

This is all to say mother's allegations that she had been methamphetamine free for a period of eight months and had been released from custody were not compelling reasons that the proposed order was in the children's best interests. Mother's allegation she had been sober for a period of eight months, several of which she was in custody, carried little weight in light of her long history of substance abuse and multiple periods of sobriety and relapse. Mother had reported using methamphetamine since she was 17 years old. At the time the dependency proceedings were initiated, she was 39 years old, which indicates she has struggled for over half of her life and the entirety of her adulthood with her addiction. Her relapses had a demonstrable negative effect on her children, as evidenced by her history of child welfare referrals, the facts leading to the present case, and M.B.'s comments at the section 388 hearing that she did not want to go through "another relapse" with mother and she and Matthew did not want to get hurt "again." Further, as the agency points out, mother made no allegations as to whether she had begun to or was willing to address her mental health issues or demonstrated disregard for the children's physical safety.

13.

Further, mother's allegation that "[h]aving a mother to share custody, co-parent and share in the upbringing is best for any child" was a general statement, insufficient to make a prima facie showing that her proposed order was in the best interests of the children. (See *In re Justice P.* (2004) 123 Cal.App.4th 181, 192 ["The presumption favoring natural parents by itself does not satisfy the best interests prong of section 388."].) Mother made no particularized showing that Joshua would receive benefit from her receiving services. Based on the record, the juvenile court could reasonably conclude it was unlikely she would have succeeded in reunifying with Joshua. Mother had made no effort to engage with any services to which she was referred prior to her incarceration. She made no effort to visit with the children at any point during the proceedings until after she was released—a period of almost nine months. Mother concedes on appeal this failure "did not weigh in her favor" as to whether her request was in Joshua's best interests. She further concedes the fact that Joshua had been out of mother's care for a period of 10 months also weighed against the court granting the petition.

Nonetheless, mother argues she sufficiently alleged her request was in Joshua's best interest because Joshua's father was likely going to have his reunification services continued, summarizing her position by stating "because [m]other's contact with [Joshua] was not detrimental [based on the posture of the case], it was beneficial." We disagree. Mother's assertion that she sufficiently showed her proposed order was in Joshua's best interest by showing Joshua's father's reunification services were likely to be continued does not persuade us the juvenile court abused its discretion. To support her position, mother relies on two passages from *In re Liam L.* (2015) 240 Cal.App.4th 1068 (*Liam L.*), where the court noted that the " ' "finding of detriment standard" and the "best interest standard" ' " (*id.* at p. 1084) are " 'basically two sides of the same coin' " and that " '[w]hat is in the best interests of the child is essentially the same as that which is not detrimental to the child.' " (*id*. at p. 1085). Mother takes the *Liam L.* passages out of context, and as such, her reliance on the case is misplaced.

14.

The passages cited by mother, read in context, are limited to the specific issue before the court in *Liam L.*,—the showing required for a *noncustodial* parent's postdisposition request for custody. When a noncustodial parent requests custody of a dependent child at the time of disposition, section 361.2 mandates the child be placed with the noncustodial parent *unless* the opposing party can show such placement would be detrimental to the child. Applying this concept to a postdisposition request for custody, the *Liam L.* court held that, in order to maintain consistency with section 361.2, "[a] noncustodial parent … makes a prima facie case of best interests, under section 388, when the noncustodial parent requests custody of the dependent child postdisposition." (*Liam L.*, *supra*, 240 Cal.App.4th at p. 1085.) The *Liam L.* court explained, "[t]his minimal burden reflects the noncustodial parents' constitutional right to care and custody of the child and the law's presumption that the child should be placed with his or her parents whenever possible." (*Ibid.*) The *Liam L.* court went on to explain that in that specific context, the opposing party has the burden to show detriment based on the requirements of section 361.2, subdivision (a). (*Liam L.*, at pp. 1085–1086.) The *Liam L.* court simply extended the presumption that placement with a noncustodial parent would be in the child's best interest to postdisposition requests for custody. Notably, it expressly did not consider whether the presumption also applied to noncustodial parents who had participated in reunification services, and whose services had been terminated due to failure to make progress. (*Id.* at p. 1086.)

As such, we find *Liam L.*'s analysis as limited to its facts and do not find that *Liam L.* stands for the proposition that mother is using it to support—that she was only required to show Joshua's father's services would be continued in order to show her receiving services was in Joshua's best interests. Mother is not similarly situated to the parent in *Liam L.*; she was not a noncustodial parent at the time of removal and, thus, was not entitled to the presumption of section 361.2 that placement with her was in the children's best interests. Rather, she was a custodial, offending parent, and the court had

already made a detriment finding at the dispositional hearing to justify not ordering mother be provided initially with reunification services. As we have stated, mother notably did not challenge the trial court's detriment finding at the time of the disposition hearing.[6]

In sum, we disagree with mother's claim she was only required to show that Joshua's father's services would be continued to show her proposed order was in Joshua's best interest. Further supporting our position is that mother cites no authority to support the proposition that a court is required to find services for one parent are in the best interest of the child, simply because the other parent is receiving services. To the contrary, in cases where a parent has failed to participate in services or make progress toward reunification, appellate courts have concluded juvenile courts are not precluded from terminating that parent's services even though the other parent continued to receive services. (See *In re Jesse W.* (2007) 157 Cal.App.4th 49, 64 ["[E]ven when a section 366.26 hearing is not set, the termination of services previously not utilized or wanted is a step toward eliminating uncertainty in the lives of very young children and ultimately achieving the stability and permanence the Legislature sought to provide for them."]; see also *In re Katelynn Y.* (2012) 209 Cal.App.4th 871.)

For the reasons we have already discussed, the court did not abuse its discretion by concluding mother had not made a prima facie showing that her proposed order was in

---

[6]  As the appellate court stated in *In re Jonathan P.* (2014) 226 Cal.App.4th 1240: "The 'finding of detriment standard' and the 'best interest standard' are not legal equivalents. In general, under the detriment standard, … the party who is opposing placement has the burden to show by clear and convincing evidence that the child will be harmed if the nonoffending parent is given custody. In contrast, under the section 388 'best interest standard,' the parent seeking to modify the placement order shoulders the burden to prove both a change in circumstances and that the modification would be in the best interest of the minor." (*Id.* at p. 1256.) The *Liam L.* court agreed that the *Jonathan P.* court was "correct as a general matter," though it did not find the distinction apt "in the context of a noncustodial parent's request for custody of his or her dependent child postdisposition." (*Liam L.*, *supra*, 240 Cal.App.4th at p. 1085.)

Joshua's best interests and, accordingly, summarily denying her section 388 petition. In the context of the entire factual and procedural history of the case—the reasons for initial removal; mother's lack of effort before and after her incarceration; the negative effect mother's substance abuse and mental health issues had on her older children and the risk they posed to young Joshua; Matthew and M.B.'s expressed desire not to reunify with mother; mother's failure to address her mental health issues and disregard for the children's safety in her section 388 petition; and Joshua not having seen mother for a period equal to approximately half his life—the juvenile court could reasonably conclude ordering mother to receive reunification services would have had a negative effect on the stability Joshua was enjoying at the time mother brought her petition and, thus, was not in his best interests.

We find no error.

## **DISPOSITION**

The juvenile court's June 28, 2021 order denying mother's section 388 petition is affirmed.