Filed 7/19/16  C.T. v. Superior Court CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| C.T. et al., | |
| Petitioners, | E065579 |
| v. | (Super.Ct.No. SWJ1300439) |
| THE SUPERIOR COURT OF RIVERSIDE COUNTY, | O P I N I O N |
| Respondent; | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | |
| Real Party in Interest. | |

ORIGINAL PROCEEDINGS; petition for extraordinary writ.  Timothy F. Freer, Judge.  Petition denied.

David A. Goldstein for Petitioners.

No appearance for Respondent.

1

Gregory P. Priamos, County Counsel, Carole Nunes Fong, Deputy County Counsel, for Real Party in Interest.

The juvenile court terminated the parents'[1] parental rights on March 27, 2015.  On September 16, 2015, pursuant to a declaration for a warrant requested by personnel from Real Party in Interest, Riverside County Department of Public Social Services (Department), the juvenile court issued an order to remove Minor, R.W. (born in May 2013), from the home of petitioners, C.T. and J.T, the prospective adoptive parents (PAPs).

The PAPs filed an objection to the removal.  After a hearing on the matter, the juvenile court overruled the PAPs' objection.  In their petition, the PAPs contend the court abused its discretion in overruling their objection because the Department adduced insufficient evidence to support a finding that removal was in Minor's best interest.  The petition is denied.

## I.  FACTS AND PROCEDURAL HISTORY

The Department initially took Minor into protective custody from her parents on June 26, 2013.  The juvenile court detained Minor on July 8, 2013, but returned her to the parents' care on December 5, 2013.  The Department again took Minor into protective custody on March 17, 2014.  The Department placed Minor in the PAPs' home on December 18, 2014.  On March 27, 2015, the court terminated the parents' parental rights.

---

[1] The parents are not parties to this petition.

2

In the permanency status review report filed on September 2, 2015, the social worker noted Minor "is an active and energetic two year old girl. [She] can run, jump[,] and climb. She enjoys exploring her environment and social interactions. This summer she has participated in swim lessons, t-ball, gymnastics, soccer[,] and dance."

The social worker further observed that Minor "has adjusted to the home setting and established healthy attachments to her caregivers. She identifies her caregivers as her parents. [She] appears happy and appropriately cared for in the home. Her ongoing needs continue to be met by the caregivers. The caregivers have indicated their commitment to adopt and provide [her] a stable and nurturing home." The social worker recommended Minor continue to remain in placement with the PAPs as it "remains the most suitable to meet her needs."

On September 16, 2015, Department personnel filed a declaration in support of a warrant to remove Minor from placement with the PAPs. The PAPs reported that on September 7, 2015, Minor flinched and pulled her hand away when the prospective adoptive father (PAF) attempted to wash her hand. The prospective adoptive mother (PAM) took Minor to urgent care the next day, where Minor was diagnosed with an arm fracture.

The PAPs reported that Minor had fallen twice on their concrete patio on September 6, 2016, but that she did not cry and continued to play. On September 14, 2015, Minor was examined by Dr. Mark Massi, who found two arm fractures. Dr. Massi opined that "'[t]he pattern of fractures in this case-radius more proximal than ulna-is

3

atypical and would not be expected from such a small child falling while running. The . . . team evaluation is "suspicious for physical abuse.""" The juvenile court issued the warrant on the same day it was requested.

On September 17, 2015, the PAPs filed an objection to Minor's removal. The PAPs reported that Minor complained of pain on September 7, 2015; they took her to day care the next day, during which nothing unusual was observed. The PAM took Minor out of day care early to take her to the doctor, but the doctor found nothing wrong; he took cautionary X-rays and sent Minor home.

The doctor called back later to report the X-rays had revealed a fracture to the right ulna.[2] The PAPs took Minor back to the doctor's office, where her arm was splinted. The PAPS reported the injury to the Department.

On September 11, 2015, the PAPs brought Minor to an orthopedist, who performed additional X-rays and casted the arm.

The PAPs posited four potential sources for Minor's injuries. First, on August 30, 2015, Minor fell off their couch onto the laminate flooring after which she cried briefly and developed a bump on her forehead the next day. The bump disappeared a few days later. Second, on September 6, 2015, the PAM placed a flotation device on Minor

---

[2] The radiologist's report reflected findings that Minor's "ulna appears intact. There is abnormal angulation of the proximal radial shaft. There appears to be faint adjacent periosteal reaction." The radiologist's "impression" was that Minor suffered from an "[a]cute-to-subacute appearing nondisplaced, mildly angulated proximal-third radial shaft bowing fracture."

4

through her arms for purposes of swimming, after which Minor complained and asked that it be taken off.

Third, on the same date, while in the pool, the PAM threw Minor into the air several times and caught her as she went underwater. Minor did not complain of any pain and requested that the PAM repeat the activity. Fourth, again on the same date, Minor fell twice while running on the concrete patio. Minor did not cry either time. On September 23, 2015, the PAPs filed a request for de facto parent status.

In an addendum report filed September 24, 2015, the social worker noted the urgent care doctor who had originally treated Minor opined that the injury was approximately two weeks old. During a home inspection on September 9, 2015, Minor was seen "laughing and smiling at the caregivers . . . ." Minor "was seen with no visible marks or bruises. Her right hand and arm [were] wrapped in an ace bandage to cover the temporary cast. [Minor] was seen playing and was very active. She was also seen using her right hand and moving her fingers. She appeared to be bonded with the caregivers, as she wanted to be held by both [the PAPs]. [Minor] identified [the PAM] as 'mommy' and [the PAF] as 'dada.'"

Dr. Massi reported that due to the fractures being near the wrists and elbow and the direction of the injuries, the injuries took place while Minor's wrists were facing up, which would be inconsistent with falling to the ground. He reported the injuries were evidence that her arm may have been twisted and pulled and were suspicious for physical

5

abuse. The social worker concluded that the PAPs "fail to acknowledge the severity of the injuries and continue to minimize the concerns of questionable fractures."

In an addendum report filed December 10, 2015,[3] the social worker noted the PAPs had visited with Minor five times since removal. The social worker observed the PAPs "were appropriate during the visit and provided [Minor] a number of gifts. [Minor] appeared to enjoy her gifts and visit with the [the PAPs]. At the end of the visit, [Minor] collected her gifts and hugged them goodbye with no display of emotion. [Minor] appeared happy to return to her current placement and share her new belongings with her foster mother." Minor's cast had been removed and no further treatment for her injuries was necessary.

On December 11, 2015, the contested hearing on removal began.[4] Dr. Anthony Nguyen, a board certified pediatrician, testified he was Minor's treating physician on September 8, 2015. He examined her arm, on which he found a bruise. Minor did not appear to be in distress; she appeared playful. Dr. Nguyen had an X-ray taken of Minor's arm; he did not observe any injury so he sent her home. A radiologist who later examined the X-ray noted an injury he diagnosed as a mild angulated fracture of the radius with a callus or healing calcification.

---

[3] The juvenile court twice continued the hearing on the PAPs' objection to removal.

[4] The hearing was held on five separate days over the course of four months.

Dr. Nguyen called the PAPs to have them return to the medical office. He placed Minor's arm in a splint and sling. Dr. Nguyen referred Minor to an orthopedist. He had no concern that Minor had been abused. Dr. Nguyen noted that it is very common for toddlers to incur fractures on the radius due to a fall.

Dr. Mark Massi, a forensic and board certified child abuse pediatrician at Loma Linda University Medical Center, testified that the most common fracture of the radial forearm to a child one and a half to three years old is a fall with outstretched hands. Dr. Massi examined Minor, reviewed Minor's medical records and X-rays, and ordered a skeletal survey, which involved additional X-rays. Other than Minor's cast, she appeared healthy.

Dr. Massi noted two fractures, one on the radius and one on the ulna. He testified that it is not unusual for there to be both a radial and ulnar fracture on a child. Dr. Massi did not see a callus, which would indicate the injury was about two weeks old, on the X-ray taken on September 8, 2014. He did see callus formation on the skeletal survey taken on September 14, 2015. Thus, Dr. Massi agreed the fractures could be two or three weeks old, occurring even prior to August 30, 2015. Nevertheless, he opined the injuries occurred on September 7, 2015.

Dr. Massi disagreed with the original radiologist's impression of the injury. He noted the fractures would have been painful and should have been noticeable to the PAPs. Dr. Massi considered the bruise noted by Dr. Nguyen to be significant "because it could indicate the location of a grab of the arm." He did not believe the fractures were

caused by a fall. Dr. Massi opined the injuries were more consistent with abuse because a grab or jerk of the arm, rather than a fall, would explain all his findings and fit within his opined time frame of the occurrence of the injuries.

Dr. Thomas Grogan, a board certified pediatric surgeon, testified he reviewed Minor's medical records and films. He noted that the X-rays taken on September 8, 2015, reflected two forearm fractures which, due to visible callus formation, were at least five days old at that time. Dr. Grogan testified there was no way the injury could have been sustained on September 7, 2015.

Dr. Grogan noted the injuries were caused by compression, which could have occurred from a fall from a couch with an outstretched hand. He testified there was no indication the injuries resulted from a blow, twist, or pull. The injuries would have healed on their own even without a cast and were common for a 27-month-old child.

A letter from Dr. Alfonso Carrillo, the radiologist who reviewed the skeletal survey ordered by Dr. Massi, was admitted into evidence. Dr. Carrillo reviewed both the X-rays taken on September 8 and 14, 2015. He agreed with the original radiologist report "stating that there is a faint periosteal reaction, early callus formation at the proximal radius and distal ulna." He opined: "This is consistent with the fracture being subacute and likely occurred greater than 24 [hours] earlier and possibly up to 14 days before the radiograph was taken depending on variables . . . . According to Radiology references, callus can generally be seen 10 to 14 days after the injury."

The case social worker testified she was assigned to the case in March 2015. Minor was considered medically fragile from birth to the time of her placement with the PAPs. Minor "seemed happy in the home." She appeared healthy and active. Minor was thriving in the PAPs' care. It appeared Minor and the PAPs were strongly bonded. Minor showed affection for the PAPs, which was reciprocated. Minor referred to the PAPs as "mommy" and "daddy."

The social worker saw Minor on September 10, 2015.[5] Minor "was running around actively, as usual. She didn't want to have her arm in a sling so it was not on her." Minor did not appear to be in any discomfort. She "climbed up and down chairs. She ate. And she was showing me toys, playing with toys and puzzles. Also, she's right-handed. So she continued to use that—that hand; although, it was in that soft cast." Minor referred to her injuries as an "owie."

The case social worker did not make the decision to remove Minor from the PAPs; that decision was made by the investigating social worker. The case social worker had observed Minor climb on top of the PAPs' toilet and furniture; the PAPs failed to redirect Minor.

The PAPs interacted appropriately with Minor during visitation since removal. Minor had asked to end visits with the PAPs. During the last visit, Minor asked to return to the foster parents. Minor no longer referred to the PAPs as "mommy" and "daddy."

---

[5] The case log reflects the date was September 9, 2015.

9

Minor had adjusted to her new home and was doing well. She referred to her foster parents as "mommy" and "daddy."

The investigating social worker testified Minor was an active child. Minor referred to the PAPs as "Da da" and "Mommy." On September 9, 2015, the investigating social worker observed Minor climb a dining room chair in the PAPs home, which is typical behavior for a child her age. However, the PAPs were not in the room with Minor the entire time, did not redirect Minor when she was climbing the furniture, and the climbing caused the investigating social worker to fear for Minor's safety. Minor was also holding a toy with her injured arm.

The investigating social worker testified that after receiving Dr. Massi's report stating that Minor had incurred two unexplained fractures, a "severe injury," her supervisor requested a warrant for Minor's removal from the PAPs' home. Department personnel had determined that the injuries were due either to abuse or neglect because no incident described by the PAPs could account for Dr. Massi's report of the injuries.

The PAF's mother testified she had witnessed Minor fall off the couch a couple weeks before Labor Day. Minor stopped crying after a few minutes; no bruises or bleeding were observed. The PAF's mother also observed Minor cry when a flotation device was placed on her on the day before Labor Day.

The PAPs testified Minor is an active child. The PAF noted she climbs and jumps on the couch. One day, Minor was on the couch and the PAF heard her start to cry and found her face down on the laminate floor. Minor cried for about three to five minutes

10

while the PAF comforted her. Afterward, he observed no visible injuries. She made no complaints of pain. Minor had a bruise on her forehead the next day.

Minor fell twice while running on the patio the day before Labor Day. She cried briefly, but sustained no injuries. The PAF later attempted to clean Minor's hands and she winced, flinched, and turned away. The PAM felt a bump on her wrist.

The next day the PAM took Minor to day care with instructions for the day care workers to keep an eye on her arm. When she picked up Minor to take her to the doctor, day care personnel expressed no concern regarding Minor's arm. She was described as normal and happy. The PAM waited a day to take Minor to the doctor because the doctor's office was closed on Labor Day.

Minor still refers to the PAPs as "mommy" and "daddy." They love Minor and still wish to adopt her.

Minor's counsel argued consistently with the Department's counsel that, at best, the PAPs neglected Minor and, at worst, abused her. Minor's counsel argued it was not in Minor's best interest to be returned to the PAPs.

The juvenile court noted that if it credited Dr. Massi's testimony, and discredited Dr. Grogan's testimony, the case was simple: Minor had sustained two severe injuries for which the PAPs had provided insufficient explanation. Dr. Massi suspected the injuries were caused by physical abuse. Thus, counsel for the Department had offered a clear case by a preponderance of the evidence that the injuries were caused by physical abuse.

11

The court found that the PAF's mother's testimony regarding Minor's fall from the couch was "inconceivable" and "defie[d] logic." The court noted it further defied logic that the PAPs did not take Minor to urgent care or the emergency room after she had taken a "significant fall" or sustained "a significant injury." The court found the PAF's reasoning for not taking Minor to the emergency room unreasonable. Thus, the court noted that even if it assumed Dr. Massi was incorrect and Dr. Grogan was correct, it would still conclude that Minor had sustained a significant fracture that required medical attention due to the pain which Minor would have exhibited upon any manipulation of her arm. Therefore, the court concluded it was unreasonable for the PAPs not to take Minor immediately to the emergency room or urgent care and a clear case had been made for severe neglect.

The court found that under either analysis, the Department had met its burden for removal. The court specifically found that the PAPs were afraid to take Minor for medical attention as soon as the injury occurred because they were afraid Minor would be removed from their custody. The court denied the PAPs' request for de facto parent status.

## II. DISCUSSION

The PAPs contend the juvenile court abused its discretion in removing Minor from their custody because substantial evidence did not support the contention that Minor's injuries were sustained through physical abuse or that Minor suffered injuries due to the

PAPs' purported neglect in failing to take her for immediate medical attention. We disagree.

"The juvenile court has the authority and responsibility to determine whether removal from the home of a prospective adoptive parent is in the child's best interests. [Citation.] If a prospective adoptive parent objects to the child's removal from the home, the [Department] must prove by a preponderance of the evidence that removal from the prospective adoptive parent is in the child's best interests. This standard applies whether the [Department] has filed a notice of intent to remove the child under [Welfare and Institutions Code][6] section 366.26, subdivision (n)(3), and the child is still in the home of the prospective adoptive parent, or the [Department] has removed the child from the home on an emergency basis under [section] 366.26, subdivision (n)(4), as here. Under either circumstance, the juvenile court determines whether the proposed removal of the child from the home is in the child's best interests, and *the child may not be removed from the home unless the court makes that finding*. [Citation.]" (*T.W. v. Superior Court* (2012) 203 Cal.App.4th 30, 45.)

"A juvenile court's decision to authorize a change in the minor's placement is reviewed for abuse of discretion. [Citation.] But we must also review the juvenile court's finding that the change is in the minor's best interests to determine whether there is substantial evidence in the record to support it. [Citations.]" (*In re M.M.* (2015) 235

---

**6** All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

Cal.App.4th 54, 64 [removal of minor from de facto parent at § 366.26 hearing reversed where order was solely based on the availability of an approved relative placement].) "'We do not evaluate the credibility of witnesses, reweigh the evidence, or resolve evidentiary conflicts. Rather, we draw all reasonable inferences in support of the findings, consider the record most favorably to the juvenile court's order, and affirm the order if supported by substantial evidence even if other evidence supports a contrary conclusion. [Citation.] The appellant has the burden of showing the finding or order is not supported by substantial evidence.' [Citation.]" (*In re Liam L.* (2015) 240 Cal.App.4th 1068, 1087.)

The PAPs invite us to reweigh the evidence which is inconsistent with our standard of review. Here, sufficient evidence supports the court's ruling. The court noted that "if" it credited Dr. Massi's testimony, there was sufficient evidence for the court to find physical abuse, for which removal would be supported. Indeed, Dr. Massi's report reflected that the location and direction of the fractures would not be supported by an explanation that Minor sustained the injuries in a fall. This is because the wrists would have had to be upright when the injuries were sustained. Dr. Massi indicated the injuries were consistent with a twist or pull which was suspicious for physical abuse.

Moreover, Dr. Nguyen's testimony that Minor had a bruise on her arm conflicted with the PAPs' and the PAF's mother's testimony and reports that Minor had sustained no *visible* injury. Furthermore, Dr. Massi testified the presence of the bruise was significant "because it could indicate the location of a grab of the arm." Thus, one

14

alternative finding by the court, that the fractures were the result of physical abuse, finds support in the record.

Additionally, Dr. Massi testified the fractures would have been painful and should have been noticeable to the caretakers. Thus, the court's alternative finding, that the PAPs' failure to immediately take Minor for medical treatment constituted neglect, also finds support in the record.

## III. DISPOSITION

The petition is denied.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
J.

We concur:

RAMIREZ
P. J.

CODRINGTON
J.