Filed 4/1/21  Joshua M. v. Superior Court CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| JOSHUA M., | F082131 |
| Petitioner, | (Super. Ct. No. JD138756-00) |
| v. | |
| THE SUPERIOR COURT OF KERN COUNTY, | **OPINION** |
| Respondent; | |
| KERN COUNTY DEPARTMENT OF HUMAN SERVICES, | |
| Real Party in Interest. | |

**THE COURT**[*]

ORIGINAL PROCEEDINGS; petition for extraordinary writ.  Raymonda B. Marquez, Judge.

David Duket, under appointment by the Court of Appeal, for Petitioner.

No appearance for Respondent.

Margo A. Raison, County Counsel, and Bryan C. Walters, Deputy County Counsel, for Real Party in Interest.

---

[*]     Before Franson, Acting P.J., Meehan, J. and Snauffer, J.

-ooOoo-

This is a petition for extraordinary writ challenging the findings and orders of the juvenile court pursuant to Welfare and Institutions Code section 366.26, subd. (*l*).[1] Petitioner Joshua M. (father) is the noncustodial father of now two-year-old Axel, who was removed from mother's custody after Axel's sibling, Ayden, died in mother's care. At disposition, the juvenile court denied father reunification services and removed Axel from his custody. A section 366.26 hearing is set for April 7, 2021.

Father contends the juvenile court erred in finding it would be detrimental to return Axel to his custody. We deny the petition.

*Previous Proceedings*

In March of 2017, law enforcement responded to a domestic violence call involving mother and father. The minor Ayden, then six months old, had scratches on his arm and forehead and redness to his abdominal area. He was described as "super dirty and smelled like feces (even with a clean diaper on)" and taken into protective custody. The residence was filthy and had no electricity or running water.

A section 300 petition was filed, alleging Ayden was at substantial risk of serious physical harm due to mother and father's failure to provide him adequate food, clothing, shelter, or medical treatment. The petition also alleged negligence or willful failure to adequately supervise and protect Ayden, based on an incident in which mother threw a can of baby formula at father while Ayden was present. In retaliation, father knocked over mother's laptop.

Ayden was ordered detained and at jurisdiction in May 2017, the juvenile court found the allegations of the petition true and Ayden adjudged a dependent of the court. At disposition in September of 2017, the juvenile court ordered reunification services.

---

[1]     All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

Father was ordered to participate in substance abuse counseling, parenting/child neglect classes, and mental health treatment, and submit to random drug testing.

In January of 2018, the department received a referral alleging mother tested positive for methamphetamines at the birth of newborn Axel. The department did not file a dependency petition on behalf of Axel but referred mother to work with "Differential Response".

In March of 2018, the juvenile court terminated father's reunification services and reduced visits to one hour monthly, with discretion to expand the visits when father began visiting regularly. Ayden was placed with mother under family maintenance.

*Current Referral*

In July of 2018, law enforcement responded to a call of an unresponsive two-year-old, Ayden. Ayden was transported to the hospital, mother taken into custody, and Axel placed into protective custody. Ayden's injuries, which included bruising on his cheek and forehead, bite marks, hemorrhaging in the eye, and a torn and actively bleeding anus, were determined to be "nonaccidental" and he was declared brain dead. The autopsy ruled the method of death was a homicide and mother, who admitted to biting Ayden, was ultimately charged with second-degree murder and other charges.

While mother identified father as the father of both Ayden and Axel, mother stated that father was not allowed to have contact with Ayden due to an earlier no-contact order. Mother had allowed father to visit Axel as Axel was not a part of the earlier dependency case, but she claimed father did not provide any emotional or financial support for Axel.

Father, who was in custody, claimed to be in a current relationship with mother, who he said used methamphetamine. Father denied any alcohol or drug use and was "trying to stay clean and sober."

*Section 300 Petition*

On July 30, 2018, the department filed a section 300 petition alleging Axel was at serious risk of harm due to the nonaccidental physical harm mother inflicted on Ayden.

3.

It was also alleged that mother failed to adequately care for Axel due to her mental illness and substance abuse.

Maternal grandfather described father as a " 'drug user … in jail for drugs' " and " '[h]e is on meth and his family uses.' "

*Detention*

At detention on July 30, 2018, both mother and father denied the allegations of the petition. The juvenile court ordered Axel detained, found father to be the biological father and ordered twice weekly supervised visits for him. Jurisdiction and disposition were set for September 5, 2018.

*Jurisdiction/Disposition*

The report prepared for jurisdiction and disposition showed father's criminal history, dating back to 2011, to include misdemeanors for obstructing an officer, shoplifting, willful cruelty to a child, petty theft, battery, a drug offense, and contributing to the delinquency of a minor. Father's scheduled release date was July 31, 2018, but as of August 27, 2018, father had not submitted any drug tests. In September of 2018, father had an outstanding misdemeanor arrest warrant issued.

The jurisdiction/disposition hearing was rescheduled numerous times, waiting for autopsy results on Ayden. Mother told the social worker she had not heard from father in a " 'long time,' " and in January of 2019, the social worker submitted a request for a diligent search to locate father. Information had been received that father had another child, James R., age two, who was found living with his maternal grandparents in a vehicle. Both grandparents were under the influence and James placed into protective custody.

*Amended Section 300 Petition*

In February of 2019, the department filed an amended petition alleging Axel was at substantial risk of harm due to the nonaccidental injuries and death suffered by Ayden,

mother's failure to provide for him, her mental health and substance abuse issues, and that she could not care for Axel due to her incarceration.

*Detention*

A detention hearing was held in February of 2019 on the amended petition. All allegations were denied, and the case continued to allow mother to seek an independent expert on Ayden's autopsy report.

In May of 2019, the juvenile court granted an ex parte petition and raised father's status to that of presumed father. After numerous continuances, the jurisdiction and disposition hearing was set for March 16, 2020.

*Jurisdiction and Disposition*

At the scheduled hearing held March 16, 2020, the juvenile court found the allegations of the February 2019 petition true. It ordered a request for placement under the Interstate Compact on the Placement of Children (ICPC) be made on behalf of maternal grandmother in Nevada. The disposition hearing was continued to May 6, 2020, to allow the department to prepare an updated report.

*Disposition Report*

The report prepared by the department for the May 6, 2020, hearing indicated that the department had sent father a letter in July of 2019 concerning the visitation order and recommended case plan components. The department informed father that telephonic/electronic visits were available, that father's status had been raised to that of presumed father, and that the social worker would be assessing whether the services provided father would be in Axel's best interests. The social worker provided father with a voluntary case plan that recommended substance abuse treatment, drug testing, child neglect/parenting classes, and a mental health and regional center assessment.

Thereafter, the social worker attempted to contact father by telephone, e-mail, and/or letter 26 times between July of 2019 and September of 2020. Of those contacts,

only a few were successful. In January of 2020, the social worker received a voicemail from father stating he had completed a parenting class.

In February of 2020, father spoke to the social worker and told her he had completed "parenting and neglect" and sent documentation to his lawyer. Father's girlfriend stated that father was participating in mental health and substance abuse services but not drug testing. Father reported that he was now residing in Oregon, a move prompted by a domestic violence incident with his girlfriend's father.

In March of 2020, the social worker spoke to father to advise him that the department had not yet received a certificate of completion for parenting and neglect. At this time, father stated he was in mental health and substance abuse counseling. He was advised to provide the name of the provider and sign a release of information so the provider could communicate with the social worker.

The report stated that father had three biological children: James (age 2), who had an open dependency case in Kern County and was in foster care; Ayden (deceased); and Axel. Father reported he had nerve damage from being stabbed by an ex-girlfriend in 2014; that he had been in special education due to learning disabilities; and he had been diagnosed as "borderline retarded" and was a client of the regional center in the past. Although father had been notified of visitation orders, he had not visited Axel and had not inquired as to visitation. Father had now moved to Idaho, and the social worker recommended that ICPC requests be commenced for the maternal grandmother in Nevada and paternal aunt in Idaho.

The social worker recommended against placement of Axel with father. The report indicated that father had had very limited contact with Axel and had not maintained a relationship with him during the dependency proceedings. The social worker also noted that reunification services for father had been terminated in Ayden's case after Ayden was removed from father's custody, and that in the case involving

6.

James R., the juvenile court found that providing services to father would not benefit the child.

The department recommended bypass of reunification services as to both mother and father. As to father, the bypass was pursuant to section 361.5, subdivision (b)(10), as he had not made any efforts to mitigate the circumstances that caused the removal of Ayden from mother's custody during the first dependency and reunification services had been terminated as to him.

At the May 6, 2020, hearing, mother and father requested a contested hearing, which was scheduled for July 22, 2020. That same day, father filed a notification of mailing address listing a residence in Idaho.

*First Supplemental Report*

The department completed a supplemental report in July of 2020, which documented a letter sent by father's girlfriend. In it, she stated that she and father were participating in a home visit system where a public health nurse came by to check on the welfare of the children in the home. Father's girlfriend requested information on doing telephone visits with Axel. In a subsequent e-mail, father's girlfriend indicated she and father were in a "parents as teachers" five-year program and were taking mental health and substance abuse classes. Father's girlfriend provided a contact name and number for both, although the latter number proved to be an invalid number. Father and his girlfriend were married in June of 2020.

In e-mails, father submitted a certificate of completion for a six-hour "New Kid by Friday" parenting class, dated January 30, 2020. He sent photographs of his current residence. The social worker noted that father failed to appear for drug tests on eight occasions between February and May 2020.

Disposition was again continued, this time to September 22, 2020.

*Second Supplemental Report*

In a second supplemental report filed for the September 22, 2020, hearing, the social worker reported that she had arranged for a visit for father with Axel on July 12, 2020, but he had missed it as he was shopping. He missed a makeup visit the following day as well.

In late July 2020, the social worker spoke with father and now wife and asked them what had changed in their situation between 2017 and 2019. Father claimed he was not living in the home when the department intervened in both Ayden and James R.'s situations, and that his relationships with both mothers was so strained that they withheld visits to punish him. While father claimed that he wanted to remain active in his children's lives, their mothers had made it too difficult and excluded him from their lives. Father felt he was improperly painted as the "bad guy" in both the Ayden and James R. cases. According to father, he was homeless at the time Ayden came into dependency, also when Axel did, and so working on stabilizing himself was the best thing he could do.

Father and his wife had a child together, I.M., who was born in 2019. Father described his relationship with his wife as great and "the healthiest relationship" he had ever been in. According to father, a public health nurse saw and weighed I.M. twice a month.

Father claimed he had also informed the department about his addresses, but that he had not received anything related to drug testing, even when promised by e-mail that that information would be provided him.

Father described mother as a violent and "horrible person" who was not "level-headed" enough to care for children. Father claimed mother lied to the department about him, making it sound like he was the horrible parent. According to father, he did not participate in his case plan involving Ayden because he was homeless and did not have any money. He stopped visiting Ayden due to mother and her father's threats.

Father claimed he was "never on meth" but his drug of choice had been marijuana. Since he claimed he did not have a drug issue, he did not know why he had to complete

8.

substance abuse treatment.  He then acknowledged methamphetamine use between 2012 and 2014, but not since.  He again complained that he had never received information on drug testing.

Father complained that, when he did attend court, he was not allowed to explain his "side of the story" and that mother lied and painted him out to be a horrible person.  Father denied being abusive to mother, and claimed he had "no part in his children being placed into protective custody because they were with their mother at that time."

In August of 2020, the social worker spoke to the Oregon social worker who had been involved in an investigation concerning I.M.  The original concerns involved the family living with a registered sex offender.  The social worker then realized that father and his wife both had some sort of mental health concerns and delays; they had hygiene issues; and father did not take direction well.  She believed it was just a matter of time before I.M. was removed from their care.  The case closed when the family moved to Idaho.

In August of 2020, the social worker also spoke to someone at a New Directions program, who first saw father's wife due to postpartum issues, and subsequent visits included father.  She described father as having a mood disorder, aggressive, with an oppositional disorder, and hallucination.  The clinician had seen father and his wife for three to four sessions but had not seen them in two months.

Father failed to attend video visits with Axel on August 5, 6, and 12, 2020, although father's wife stated that they had attempted to do so.

Also, in August of 2020, the social worker spoke to a clinician at a mental health and substance abuse program, where father had been admitted in January of 2020 for mental health concerns and cannabis use.  He had not completed the treatment and had not returned.

On August 19, 2020, the social worker spoke to a registered nurse at a Parents as Teachers program in Idaho.  While father's wife had given verbal permission to the social

worker to discuss the case, she had not signed a written release, so the nurse was not able to discuss further.

On August 20, 2020, the social worker spoke to a CPS worker in Oregon, who confirmed that father and his wife had prior CPS involvement in Oregon.

On August 20, 2020, the social worker spoke to father and wife's landlord, who acknowledged not knowing the couple well, but that he thought they were good and attentive parents. They were not paying rent but being supported by a local church.

On August 25, 2020, father's wife sent an e-mail to the social worker to state she had not paid the telephone bill, making it impossible to visit Axel or for father to call to drug test. Father had failed to drug test on 10 occasions between February and July 2020. On August 28, 2020, father's wife sent the social worker an e-mail asking why father was required to do a substance abuse program when he was never charged "of a crime with drugs."

The department continued to recommend that services be bypassed for father under section 361.5, subdivision (b)(10).

*Third Supplemental Report*

A third supplemental report, submitted to the juvenile court for the now scheduled December 8, 2020, hearing, stated that father had missed an October 5, 2020 visit and several parenting classes as well. A reminder of father's case plan was sent to him on October 20, 2020. Father had had 14 opportunities to visit since the prior hearing in September 2020 but had failed to contact the department for any of them. The department continued to recommend services be bypassed.

*Disposition Hearing*

At the December 8, 2020 hearing, mother was present in custody; father did not appear but was represented by counsel.

Father's counsel called the intake social worker, who testified that she believed the family services social worker had mailed father drug test kits, but she acknowledged that

10.

father claimed he did not receive them. The social worker testified that she had spoken to people in Oregon and Idaho and that father was receiving treatment for marijuana use. The social worker acknowledged that neither the registered nurse at the parenting program nor the landlord had mentioned concerns about substance abuse.

Father's counsel argued for placement of Axel with him as the non-custodial parent, relying in part on the fact that father had "a new baby, successfully in his care." Counsel alleged the bypass provision did not apply.

After argument, the juvenile court summarized the reports prepared by the department and then adjudged Axel to be a dependent of the court. It found, by clear and convincing evidence, that there was no reasonable means to protect Axel without removing him from mother and father's custody. The juvenile court found that father made minimal progress toward alleviating or mitigating the causes necessitating Axel's placement in out-of-home care. It found that the bypass provision to reunification services applied and, even if it did not, "the evidence shows that [father] has not completed substance abuse treatment; he did not participate in drug testing. He completed one six-hour class of parenting and did not complete mental health treatment or treatment for his cannabis dependency."

The juvenile court found further that placing Axel with father would be detrimental, as the time for reunification services had lapsed as Axel had been placed into protective custody on July 26, 2018, almost two and a half years ago.

The juvenile court set the case for a hearing under section 366.26 to be held April 7, 2021. Father filed a timely notice of intent to file a writ petition on December 14, 2020.

## DISCUSSION

Father is a noncustodial parent as defined by section 361.2, subdivision (a).[2] At the time of the events that gave rise to the department's involvement, mother had custody of Axel, along with his brother Ayden. Accordingly, a plain reading of the statute dictates that section 361.2 is applicable here. (See *In re Liam L.* (2015) 240 Cal.App.4th 1068, 1080 [noting that § 361.2, subd. (a) accords statutory priority to placement with a "noncustodial parent"].)

Under section 361.2, if the noncustodial parent requests custody, "the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child." (§ 361.2, subd. (a).) The party opposing placement with the noncustodial parent has the burden to prove by clear and convincing evidence that such placement would be detrimental. (*In re C.M.* (2014) 232 Cal.App.4th 1394, 1402; *In re D'Anthony D.* (2014) 230 Cal.App.4th 292, 301.)

In assessing whether to place a child with a nonoffending parent, the juvenile court examines the circumstances of the parent and child and weighs all factors to determine if the child will suffer harm. (*In re Nickolas T.* (2013) 217 Cal.App.4th 1492, 1506; *In re Luke M.* (2003) 107 Cal.App.4th 1412, 1425.) Because a detriment finding requires the court to weigh all relevant factors to determine if the child will suffer harm, no one factor is dispositive. (*Luke M., supra,* at p. 1425.) Factors to consider include any jurisdictional findings against the parent, any criminal history, substance abuse or mental illness, the

---

[2] Section 361.2, subdivision (a) provides: "If a court orders removal of a child pursuant to Section 361, the court shall first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child. If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child.…"

12.

age of the child, any special needs the child may have, and the nature of the relationship between the parent and the child and the ability of the parent to meet the child's needs. (*In re Patrick S.* (2013) 218 Cal.App.4th 1254, 1263, 1265; *In re Nickolas T., supra,* at p. 1505; *In re Luke M., supra,* 107 Cal.Ap.4th at pp. 1425–1427.)

The issue of whether Axel would suffer detriment in father's care is reviewed for substantial evidence. (*In re Liam L., supra,* 240 Cal.App.4th at p. 1087.) We must "review the record in the light most favorable to the court's order to determine whether there is substantial evidence from which a reasonable trier of fact could find by clear and convincing evidence that the children would suffer such detriment." (*In re Luke M., supra,* 107 Cal.App.4th at p. 1426.) We do not evaluate the credibility of witnesses or reweigh the evidence but draw all reasonable inferences in support of the findings of the juvenile court, considering the record most favorably to the juvenile court's order. (*In re Liam L., supra,* 240 Cal.App.4th at p. 1087.)

Father contends the disposition order denying him placement of Axel is not supported by substantial evidence. In support of his argument, father contends there is favorable evidence to support the opposite determination, namely that he has another child, I.M., who was born in December of 2019 and always been in his home, along with I.M.'s mother, father's wife, whom father had been in a healthy relationship with for three years. Father also cites to the coping mechanisms he had learned to use, the programs he had been involved in, his participation in mental health and substance abuse treatment, and the lack of evidence of any substance abuse in father's home. He further cites to the fact that he and his family had been in their current home in Idaho since February 2020; that they had family and friends and professional support in Idaho; and that he had inquired what clothing size and Axel's interests were and what supplies were needed for his and medical care. Father argues that, while he had not visited Axel, there was no evidence of physical or emotional detriment that required the juvenile court to deny placement of Axel with him. In conclusion, father argues that the fact that he had

"continued, current, retained custody of I.M." should alone be "sufficient to overcome any implied or actual concern over Axel's well being with his father …."

We disagree. The juvenile court had before it father's prior history, combined with his failure to participate in his earlier court-ordered reunification plan. In the 2017 proceedings involving Ayden, the house was found to be filthy, without electricity and running water, and incidents of domestic violence were alleged between mother and father with Ayden present. Father entered a nolo contendere plea to a misdemeanor count of willful cruelty to a child related to the incident.

During Ayden's dependency case, father failed to participate in the court-ordered case plan, which included counseling for substance abuse, parent/child neglect, mental health, and random drug testing. At the six-month review, the juvenile court terminated services as to father as he failed to engage in services or visit Ayden. Father acknowledges this finding, but claims it was due to his homelessness and lack of money to attend classes.

In the current dependency, father had only managed to complete one six-hour parenting class by the time of the disposition hearing, held almost two and a half years after Axel was detained. Father completed no mental health or substance abuse treatment, but instead questioned the need for such services, claiming he had never been charged with a drug crime. Father consistently failed to drug test, and, as indicated in the record, on at least 10 occasions between February and July of 2020.

The social worker who provided services for father, his wife, and I.M. in Oregon stated that it was apparent that father and his wife both had some mental delays, and there were concerns that they were not feeding I.M. enough and not taking cues as to how to care for her, including feeding and changing her. According to the social worker, the family first came to the attention of the department on reports that they were living with a registered sex offender. The social worker noted that father and his wife lacked stability and opined that it was only a matter of time before I.M. was removed from their care.

14.

The Oregon case was closed when the family moved to Idaho. Father himself stated he had learning disabilities and attention deficit disorder which, according to him, impaired even his ability to grocery shop.

A clinician in Idaho expressed concerns about father and his wife's ability to care for themselves, and that father appeared to have a mood and oppositional disorder and was aggressive. She noted that father and family had moved to Idaho because of a job on Craigslist, which did not pan out and they were left on the side of the road. The clinician saw mother and father only three or four times before they quit coming.

The record contained multiple instances where father was involved in incidents of domestic violence: circumstances that led to the initial detention of Ayden; a self-reported stabbing from an ex-girlfriend in 2014; and father's move to Oregon due to a domestic violence incident involving his wife's father.

There is also evidence that Axel suffered burn injuries over 25% of his body in a prior foster home and his care providers required extensive training on how to care for him. There was no evidence that father or his wife had any similar training that would allow them to properly care for Axel's injuries.

Drawing all reasonable inferences in support of the juvenile court's findings, we find substantial evidence supports the juvenile court's decision not to place Axel with father and reject father's claim to the contrary.

## DISPOSITION

The petition for extraordinary writ is denied. This court's opinion is final forthwith as to this court pursuant to California Rules of Court, rule 8.490(b)(2)(A).