Filed 11/16/21  In re E.F. CA1/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re E.F., a Person Coming Under the Juvenile Court Law. | |
| ALAMEDA COUNTY SOCIAL SERVICES AGENCY, Plaintiff and Respondent, v. K.F., Defendant and Appellant. | A161456 (Alameda County Super. Ct. No. JD02827301) |

K.F. (father) appeals from the juvenile court's order denying his third Welfare and Institutions Code section 388 petition without a hearing.[1]  On appeal, he contends the trial court erred in denying his petition because (1) the Alameda County Social Services Agency's (Agency) search efforts to locate him were not diligent and (2) he was deprived of his right to invoke section 361.2.  We affirm.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

In May 2017, the Agency filed a petition alleging a failure to protect (§ 300, subd. (b)), and to provide support (§ 300, subd. (g)) for minor, after mother was placed on a section 5150 psychiatric hold and because father's whereabouts were unknown.

In its detention report, the Agency observed that after mother was admitted into the hospital, she "refused to communicate and did not identify any family or friends to care for minor," telling hospital staff " 'normal people do not talk.' " The social worker was later informed that "father lives in Taiwan," however, the worker did not then know father's name, address, or phone number.

Minor, who was eight years old at the time, did "not communicate with adults." When adults spoke to him, he would "immediately freeze[] and turn[] his head so that there is no eye contact." Minor shook his head no, when asked if he "could live with his father." Minor was later diagnosed with posttraumatic stress disorder, selective mutism, and major depressive disorder.

The court found a prima facie showing had been made that minor was a child described by section 300, ordered minor detained, and set the matter for a jurisdiction and disposition hearing. After learning father's name, the Agency served him with notice of the hearing at mother's address.

When the Agency prepared the jurisdiction/disposition report, father's whereabouts were unknown. According to mother, she was born and raised in Malaysia and maternal grandparents were born and remained in Malaysia. Mother stated father was "out of the country." She also stated she had previously lived in New York, where minor was born, and that "in the

---

[2] We relate only those facts relevant to the issues on appeal.

state of New York she has full legal custody of [minor]." The Agency had commenced a "formal search" for father in May 2017, the results of which were pending, and a family finder worker had been assigned to the case.

Mother's story as to her relationship with father changed throughout the proceedings. Mother initially informed social workers she had never been married. Later, even after having produced a November 2012 judgment of dissolution for her and father, mother continued to inform social workers she had never been married.

In an addendum report, the Agency stated that because father was listed on minor's birth certificate and because the judgment of divorce showed parents were married, father "could be found as presumed father, should he come forward and make that request." It also noted the Agency's search clerk had "declared that the whereabouts of [father] . . . is unknown and that reasonable efforts have been made to ascertain his whereabouts."

At the jurisdictional hearing, the court adjudged minor a dependent of the court, found true the allegations in the section 300 petition, ordered reunification services for mother, and set the matter for a six-month review hearing. The court ruled the Agency was not "required to provide reunification services to [father], because he is an alleged father, unless and until he establishes a legal basis for receiving those services."

In a February 2018 status review report, the Agency stated a "new search request" for father would be submitted. Meanwhile minor, who had been at his previous foster care placement for six months, was moved to a new placement after a shooting occurred at his prior placement, killing two people and injuring his foster caregiver. In searching for "[p]otential [r]elative [c]aretakers," a social worker noted mother reported "all of the paternal relatives moved back to Malaysia several years ago," and that

3

minor's "maternal aunt also lives in Malaysia" and they had never met in person. Additionally, maternal grandparents lived in Malaysia.[3]

In a July 2018 status review report, the Agency stated another "formal search" had been submitted for father two months prior, and the results were pending. In the section for "[p]otential [r]elative [c]aretakers," the social worker noted she had been trying to reach maternal grandparents, "however, the international function" on her phone "ha[d] not been working." Instead, the social worker stated she would pass their contact information onto the new social worker who was being assigned the case.

At the 12-month review hearing, the court terminated reunification services to mother but did not set a section 366.26 hearing because the minor was not in a concurrent home.

Six months later, in a March 2019 status review report, the Agency noted father still had not been located and his whereabouts remained unknown. Mother reported all of minor's paternal and maternal relatives "reside in Malaysia." The social worker reported "connecting with the relatives in Malaysia was unsuccessful," and that mother "reported that there are no other known family members willing to care for [minor]." Minor, then nine years old, had been in foster care for almost two years. He had recently had an initial visit with a proposed adoptive family, with a second visit scheduled.

At the review hearing, the court continued minor as a dependent child and found the permanent plan of remaining with his current foster parent and permanent plan of adoption were appropriate.

---

[3] Neither the minute order nor the reporter's transcript for the six-month review hearing is contained in the record.

Five months later, in an August 2019 status review report, the Agency recommended the court set a section 366.26 hearing. Father's whereabouts remained unknown, and the Agency "last had contact with . . . mother" in March. Minor, now 10 years old, had been recently placed in the home of his prospective adoptive parent, and the adoptive parent reported minor was "thriving in her home," and she saw "no concerns moving forward to a plan of adoption." Minor remained mostly "non-verbal," and spoke "minimally to adults" but expressed that he "like[d] his new potential adoptive mother," and since being placed in the home he had "become much more verbal."

At a September 2019 review hearing, the court found the "permanent . . . goal of termination . . . of parental rights and adoption is appropriate" and that reasonable services had been offered and set the matter for a due diligence hearing and a section 366.26 hearing.

A month later, the Agency filed a due diligence report, requesting the court "make a due diligence determination regarding the alleged father . . . and find that the Agency exercised due diligence in its efforts to ascertain his whereabouts and authorize notice of hearing by publication for the alleged father and all unknown fathers." The Agency outlined its recent search attempts: In September 2019, a social worker had submitted another "formal search request," and the results indicated the whereabouts of father were unknown. In October 2019, a worker had searched several databases for father, including the California Department of Corrections and Rehabilitation Inmate and the Federal Bureau of Prisons Inmate Locators, the Consolidated Records Information Management System, and the National Victim Notification Network, among others. That search resulted in two New York addresses for father (or someone bearing the same name as father). Letters had been sent to both, but the Agency had received no reply.

The social worker also performed searches on "various social media outlets." Finally, in October 2019, the worker had spoken to someone at the Consulate General of Malaysia in Los Angeles and was "instructed . . . to send an email explaining the nature of the request and information regarding the alleged father along with a copy of the minor's birth certificate." After obtaining permission from the court to send minor's birth certificate, the worker had forwarded all the requested information to the consulate.

The court found the Agency had exercised due diligence in its efforts to locate father, that notice had been given as required by law, that "notice by publication to the unknown father is likely to lead to actual notice of him," and that the "alleged father may be provided notice of hearing by publication" or could be "personally served if found by the Agency."

In its section 366.26 hearing report, the Agency updated the court on father's whereabouts. The social worker reported that after the due diligence hearing, and two and half years after the Agency filed the section 300 petition, mother provided the Agency with "an address for father in Malaysia." In the meantime, the Agency had filed a "citation for publication" for father or "anyone claiming to be a parent" of minor, but that notice "was published in a local publication and not in Malaysia" where it now appeared father resided.

After twice attempting to contact father, the social worker had finally been able to talk to him using an interpreter. He was "not in agreement with the permanent plan of adoption," and wanted minor placed in his care. The Agency therefore requested a 75-day continuance so that father may be "properly noticed for the hearing."

The Agency recommended a permanent plan of adoption. Mother reported father had helped cared for minor when they lived in New York, but

6

father had "had no contact during this dependency matter." An adoption assessment had been completed, and minor had "established a positive connection with his current caregiver."

At the hearing on the matter, the court first granted father's counsel's request that he be elevated to "presumed father" status. The court next heard from father's counsel regarding her intention to file a section 388 petition requesting the court set aside jurisdiction. Counsel stated, "As I look through all the reports that I saw, it looked like the Agency continued to notice, or through searches in the United States. And from the beginning of the case, going back as far as May 2017, there was information that the father was not going to be found in the United States."

The court observed, "it's my recollection, and I've been on this case since the beginning, that the information that was provided to the Agency, as well as the Court, was that the whereabouts of the father were unknown. [¶] And I'm not really sure what the—were [*sic*] the jump is, to the Agency should not have been doing a search here, in the US: The Agency should always do a search here, in the US, to confirm that there is not a parent located here in the States, so that we can contact that parent specifically in this state. [¶] So, I'm not really sure. Again, give me another reason for the basis for setting a hearing to set aside."

The court then questioned mother as to whether she knew where father had moved after he left. Mother replied, "He returned to Malaysia." Mother stated she had father's address all long, but acknowledged she only gave it to the Agency "One-and-a-half months ago." She had also only recently told father minor was in foster care. She had not done so sooner because she was "afraid [paternal relatives were] going to be sad. And they're going to scold

me.  So, two months ago, I thought that I should have been telling them early on.  And then I told my family, also."

After an off-the-record conversation with counsel, the court stated, "From the Court's perspective, between detention and juris dispo, the Agency had very little information that would indicate that they should be looking for the father in Malaysia.  I don't think there was any information, to be quite frank, as to where father was located.  [¶] Throughout all the reports, there were periods where Mother said she had been married, and there was a dissolution of marriage.  And other periods where she says she had never been married.  [¶] In addition to that, Mom did state that she had relatives in Malaysia, and that there were paternal relatives in Malaysia, and much later on, in juris dispo.  [¶] She also provided information to the Agency for those maternal relatives.  And the Agency reached out to relatives in Malaysia, and was unable to contact any of those relatives.  [¶] What I did not see in any of the reports that have been filed in this case, is Mom saying she had contact information, or a phone number for the father, or had been in contact with the father."

The court continued, "It is not as though the Agency did absolutely nothing to try to ascertain the whereabouts of the father.  In fact, report after report included multiple searches here in the states, and the state, as well as trying to contact relatives in Malaysia, through a family finding and engagement worker. [¶] So, it's the Court's position, based upon that information, that both detention and jurisdiction disposition happened as they should have, based upon the information provided to the Agency."  Finally, the court noted, "it disturbs me that all this time Mom had contact [information] of the dad, and did not provide that information to the Agency until about a month-and-a-half ago."

8

The court found the Agency had made reasonable efforts to return minor and that reasonable services had been provided but continued the section 366.26 hearing to allow father to file a section 388 petition for "a lack of due diligence to find the father, and lack of notice to the father."

In the subsequently-filed section 388 petition, father requested that the court "set aside jurisdiction and to stay the [section] 366.26 hearing." (Capitalization omitted.) In his memorandum of points and authorities, father maintained the Agency did not exercise reasonable diligence to locate him. He contended that "despite information [he] was likely residing in Malaysia, the Agency took no steps to contact an international organization until over two years after the proceedings had begun." He therefore requested the court find that the "[s]earch efforts to locate [him] were inadequate;" that "notice to him was not provided according to law;" "[t]hat the section 366.26 hearing must be stayed; and" that the court "set aside all prior findings," including those made at the jurisdiction, dispositional, six-month review, 12-month review, and the permanent review hearing to allow him to "participate in this case as [minor's] legal father."

In a February 2020 status review report, the Agency stated father had had no contact with minor since he had been taken into foster care in May 2017. Minor had recently shared with his prospective adoptive parent that his last memory of father was when he and mother took father "to the Airport when he left for Malaysia." Minor, now 10 years old, had been removed from mother when he was eight years old and had not seen father "since he was 3 or 4 years old." Minor did not appear to speak Mandarin or Cantonese. His caregiver had never heard him speak anything other than English, "even during his calls with his mother." In an addendum report, the Agency noted minor was born in New York and raised there with both parents until the age

9

of three.  At that point, father "decided to move to Malaysia, leaving his son." Father reported he had not spoken to minor "in over three years."

In its opposition to father's section 388 petition, the Agency requested the court deny father's requests without a hearing because father had not shown either a change of circumstances or that his request would be in minor's best interest.  The Agency urged the court maintain the previously-set section 366.26 hearing date.

At the start of the hearing on father's section 388 petition, the court stated it was inclined to deny father's request to "nullify jurisdiction" but reserved determination on the matter until after hearing from father and counsel.

Father testified that it had been three to five years since he had spoken with minor.  Although he had spoken to mother within that time and asked about minor, mother always told him minor "was playing" or that he "would not come to the phone."  When the court asked if he found it "unusual, or odd that you've not talked to your son, you've been unable to talk to your son in five years or so?"  Father replied, he "did feel that it was a little odd," but admitted he never attempted to have anyone else "reach out to . . . mother, to try to speak with [minor]."

The Agency maintained father had failed to make a prima facie case either of a change of circumstance or that nullifying jurisdiction was in minor's best interest and that there was "absolutely no basis for delaying the section 26 hearing."  Minor's counsel joined the Agency, reiterating there was no showing in father's pleadings that granting the section 388 petition would be in minor's best interest.

10

Mother's counsel stated if the court found "father lacked notice . . . that is a change of circumstance," and it would be in minor's best interest "to have a relationship with his father."

In a protracted exchange between the court and father's counsel, counsel repeatedly tried to argue the Agency had failed "to show there is detriment" to minor being returned to father. However, the court, seeking to keep the "arguments narrow and appropriate" repeatedly stated, "You keep talking about returning a child: It's not in your [section 388 petition]." The court went on to state, "You are required to file a 388 petition that specifically asked what you want. And, so, this 388 petition does not ask—it's not asking me about custody to the father, nothing: Just asking me to get rid of jurisdiction, and, ultimately, a 26 hearing." The court repeatedly asked counsel to focus on the two requirements for section 388 petitions: a change of circumstance and minor's best interest. It further asked counsel why, even assuming there had been a change of circumstance, it would be in minor's best interest to set aside jurisdiction and the section 366.26 hearing. Counsel remained focused on the Agency's burden, and asserted the court should set aside jurisdiction "because due process has been violated," because father "was not properly noticed."

Later in the hearing, counsel submitted there was jurisdiction, but only as to mother. The court then stated, "But if you submit that there is jurisdiction, and there should be, then we stop, right here." Counsel then stated she was requesting the court set aside the jurisdictional findings as they pertain to father, the dispositional findings, the six-month review finding, the 12-month review finding, the September 2018 findings, the findings of the permanent review hearing, and the setting of the section 366.26 hearing.

11

The court once again asked how this was in minor's best interest. Counsel responded by analogizing to a case where a noncustodial parent was seeking to get custody. The court replied, "I think you're talking about two different best—I'm not sure what best interest you're talking about. You're still talking about custody? [¶] . . . [T]he request here, is not—it's not about custody. You're asking that we go back to square one. So, I just—I don't want to mix up what you're asking the court. [¶] You're asking me to set aside findings and orders. . . . [¶] I'm looking at that. That's not—that doesn't speak to custody." In any event, the court continued, "Regarding custody, I am not going to send [minor] to his father, at this time. I don't know anything about his father."

The court then asked counsel to speak to the best interest of minor in setting aside the findings and orders and jurisdiction. Counsel responded, "It was in the child's best interest that the father have been properly noticed, at the beginning of this case. My client lost that presumption that reunification with him was in the child's best interest, because he wasn't properly noticed. [¶] . . . [¶] And under the dependency scheme, he should have been given the notice that the Agency failed to provide, as well as the Court failed to provide, in failing to follow Welfare and Institutions Code section 361.2 and . . . California Rules of Court, 51635, in making an inquiry at every hearing until the alleged parent was found, and also putting in the minutes that that inquiry had been made."

The court expressed frustration over counsel's arguments, stating, "Now, this is the purpose of a 388 petition, to state it has to state, the information sufficient for me to grant a hearing. I did it anyway. . . . There's . . . not enough here for me to do that. But I did it anyway, because I don't want to waste everybody's time, and just going to make you go back and refile

it, and be more specific. But here we are. [¶] . . . [¶] And to be quite frank, I made the mistake of granting the hearing. I should have forced you to go back and to refile a [section 388 petition] that made sense, because this one doesn't." The court stated it would allow father to file an amended petition, but reiterated the court would "still have to look at what is in the best interest of the child, and I haven't heard any reason, way, shape, or form, that this in the best interest of [minor], other than the possibility of slowing down on the 26. . . . [¶] But to invalidate all of these proceedings, to ignore all of the things that have happened to [minor], during the course of this" was not in minor's best interests.

Father filed an amended section 388 petition the following month requesting essentially the same relief—that the court find "[s]earch efforts to locate [him] were inadequate;" that "notice to him was not provided according to law;" that "the section 366.26 hearing must be stayed"; and asking the court to "set aside all prior findings and orders made without notice to Father allowing [him] to participate in this case as [minor's] legal father."

Meanwhile, minor's psychiatrist recommended minor be placed on psychotropic medication. Minor had been through "a number of changes in placements and has experienced a number of traumas in his life," which had resulted in his suffering "debilitating anxiety, in particular related to relationships with others and his ability to tolerate new experiences." He experienced "strong reactions to new experiences," exhibiting symptoms such as "howling in pain, refusing to participate, experiencing heavy breathing and fast heart rate, and even dissociating at times when he is confronted with new experiences, even ones that are benign." All of which "led to [a] reduced capacity to engage in age-appropriate activities and has affected his ability to form relationships with peers and adults."

13

At the next hearing, before the court could rule on father's section 388 petition, his counsel informed the court father was withdrawing the petition. Father had spoken to the social worker and the prospective adoptive parent, and he was "willing to sacrifice his own wishes and needs to have his son return home to him, and allow his son to remain in the United States." The court then set a new date for the section 366.26 hearing.

It its section 366.26 hearing report, the Agency recommended the court order adoption as the permanent plan and terminate mother and father's parental rights.

At the start of the section 366.26 hearing, the trial court stated that minor's prospective adoptive parent had recently given a 14-day notice that she would not be moving forward with adoption but that the Agency had found another placement and minor was "familiar with the individual there." As a result of this change in placement, the Agency requested a 60-day continuance of the section 366.26 hearing.

Additionally, four days before the hearing, father filed a new section 388 petition, again seeking to set aside jurisdiction and to stay the section 366.26 hearing. In his memorandum of points and authorities, father stated "based on the fact the proposed adoptive parent . . . has abandoned her plans to care for [minor]," father "hereby resuscitates" his section 388 petition, once again because he "had not been sufficiently notified of the proceedings regarding his son." Father again requested the same relief as he had in his prior petitions: that the court find "[s]earch efforts to locate [him] were inadequate;" and "[t]hat notice was not provided according to law;" and that "the section 366.26 hearing must be stayed"; and finally that the court "set aside all prior findings and orders made without notice to Father, allowing [him] to participate in this case as [minor's] legal father."

14

The court noted father's new petition was "basically the same as it was before; to somehow wipe clean the record with any jurisdiction/disposition hearing . . . and everything else after because of an argument that the father was not noticed for hearings." The court went on to state, "we already litigated this issue ad nauseam," and now counsel presented a petition "with this same request. . . . The change of circumstance is different, but the request of the Court was exactly the same. [¶] At this point the Court's evaluating whether or not there is a change of circumstance, and whether it's in [minor's] best interest to even set a hearing."

The court was "not really sure what" counsel was requesting, pointing out that father's request was not "necessarily even for placement." The court stated, "I thought the initial filing for the 388 petition was confusing and not specifically helpful, but I allowed us to get to a hearing because I wanted to at least hear [father's counsel's] position. But under these circumstances, I see a change in circumstance, that there's a 14-day notice for the minor, but I don't see that the request is in the child's best interest to basically get rid of every finding and order that the Court has made because the findings and orders were based upon circumstances at the time." The court then indicated it would deny the petition without a hearing but would hear from counsel first.

The Agency agreed with the court, stating father's petition "fails on its face to show why the request to change is in [minor's] best interest." Minor's counsel joined, stating he had "nothing further to add about the [section 388 petition] that has not already been said."

Mother's counsel urged the court to hear the petition because "the placement or pending placement is a large issue." Here, the court interrupted stating, "So that's different. I don't know that should be heard.

15

The question is whether or not there's a change in circumstance . . . and whether the request is in the best interest of the child. . . . [¶] The request is kind of a ridiculous request to be quite frank. It is asking that the Court go back to detention, years after we have detained [minor], and to somehow make different findings and orders. That's not in [minor's] best interest because he was removed from his mother for very significant reasons. [¶] . . . [¶] And again once the Agency found out information about where the father might be, they reached out. . . . But the more important question is is this request in [minor's] best interest? The change of circumstance is not the only criteria that the Court must look at." The court then asked father's counsel to address the "best interest" issue.

Father's counsel stated, "the purpose of the [section 388 petition] is to set aside all findings and orders based on the change of circumstance. [¶] In regards to the prima facie showing, there's plenty of caselaw regarding a noncustodial parent who makes a late appearance and is requesting services and the ability to reunify. The one that's cited . . . . , *In re Liam'*. . . . [¶] That case does specifically say that it is a prima facie showing of a best interest when a noncustodial parent comes forward and asks to take care of the child."

Here, the court interrupted stating, "Absolutely not. We're not doing that today. I read your brief. I read your memo of points and authorities. I read it before. It's not the first time I read it because it's really the same brief. . . . [¶] . . .[¶] It's almost a year since the father has been back or has been involved in this case, because we had a 366.26 hearing set for December 2019. And then that's when you filed your [first section 388 petition]. So we had that hearing, and we continued that hearing . . . and then ultimately you withdrew. [¶] So there's been a whole almost right at 11 months that the

16

father has not actively been involved in this case, and your argument is if we had just found him yesterday. That's not the case. . . ." The court further stated, "I just don't see that this request is in the best interest of the child. Basically that the Court would somehow, someway find that vacating all of the findings and orders in this case would somehow be in [minor]'s best interest. I just find the . . . 388 petition to be overbroad with a request that is not even reasonable."

The court denied father's petition and granted the Agency's request for a continuance of the section 366.26 hearing.

## DISCUSSION

"Due process requires that a parent is entitled to notice that is reasonably calculated to apprise him or her of the dependency proceedings and afford him or her an opportunity to object. [Citation.] The child welfare agency must act with diligence to locate a missing parent. [Citation.] Reasonable diligence denotes a thorough, systematic investigation and an inquiry conducted in good faith." (*In re Justice P.* (2004) 123 Cal.App.4th 181, 188 (*Justice P.*).) "However, there is no due process violation when there has been a good faith attempt to provide notice to a parent who is transient and whose whereabouts are unknown for the majority of the proceedings." (*Ibid.*)

"[B]ecause the failure to give notice caries such grave consequences in the dependency court," where the Agency "fails even to make an effort to provide [the parent] the procedural safeguard of notice," reversal is mandated. (*In re DeJohn B.* (2000) 84 Cal.App.4th 100, 102, 110 [failure to attempt to find the mother and provide notice of review hearings constitutes structural error; but see *In re James F.* (2008) 42 Cal.4th 901, 916-917 [applying harmless error standard to due process challenge and cautioning

17

against use of structural error doctrine in dependency cases] & *In re Angela C.* (2002) 99 Cal.App.4th 389, 394-395 [lack of notice of continuance is trial error, not structural error, and is therefore subject to harmless error analysis].)  A parent may raise an agency's failure to provide him adequate notice through a petition under section 388.  (*Justice P., supra*, 123 Cal.App.4th at p. 189; *Ansley v. Superior Court* (1986) 185 Cal.App.3d 477, 483, 487.)

A juvenile court may summarily deny a section 388 petition without an evidentiary hearing, but "a petition must be liberally construed in favor of its sufficiency [citation] and a hearing may be denied only if the application fails to reveal any change of circumstance or new evidence which might require a change of order."  (*In re Jeremy W.* (1992) 3 Cal.App.4th 1407, 1413–1414, fn. omitted; § 388, subd. (d).)  "The parent seeking modification must 'make a prima facie showing to trigger the right to proceed by way of a full hearing. [Citation.]'  [Citations.]  There are two parts to the prima facie showing:  The parent must demonstrate (1) a genuine change of circumstances or new evidence, and that (2) revoking the previous order would be in the best interests of the children."  (*In re Anthony W.* (2001) 87 Cal.App.4th 246, 250; *In re Zachary G.* (1997) 77 Cal.App.4th 799, 806 (*Zachary G.*) ["[I]f the liberally construed allegations of the petition do not make a prima facie showing of changed circumstances and that the proposed change would promote the best interests of the child, the court need not order a hearing on the petition."].)

"In determining whether the petition makes the necessary showing, the court may consider the entire factual procedural history of the case." (*Justice P., supra*, 123 Cal.App.4th at p. 189.)  We review the juvenile court's

order denying a section 388 petition without an evidentiary hearing for abuse of discretion. (*Zachary G., supra*, 77 Cal.App.4th at p. 808.)

Father contends the trial court abused its discretion in summarily denying his final section 388 petition because "there was substantial evidence that the Agency failed to make diligent efforts to locate [him] or any relatives" and the Agency's failure to "conduct an appropriate and diligent search for [him]" deprived him of his "right to invoke section 361.2." (Boldface omitted.)

*Sufficient Effort to Locate Father*

Father asserts the "Agency and the court knew from the inception that the father and all the maternal and paternal relatives of the child lived in Malaysia, yet the searche[s] for father were limited to the United States and the State of California." However, the record shows the contrary—that at the commencement of the dependency proceeding and throughout most of it, the whereabouts of father were, in fact, unknown.

Mother provided the Agency with inconsistent and conflicting information. And although mother stated father was "out of the country" and that paternal and maternal relatives lived in Malaysia, she never told the social workers father also lived in Malaysia. Indeed, father was reported to be in Taiwan. Additionally, mother did not give the Agency father's contact information until more than two years after the section 300 petition was filed. Thus, it was entirely reasonable for the Agency to search within the United States, as mother told workers that parents had, together, raised minor in New York until they separated. Nor was the Agency's search limited to the United States and California. The Agency searched multiple databases on multiple occasions. The searches within the United States resulted in two addresses for father—or someone bearing father's name—and

19

the Agency sent letters to those addresses, but never received replies. Similarly, the social worker's efforts to contact minor's relatives in Malaysia were also unsuccessful.

Given all of the information before it, the trial court did not abuse its discretion in ruling that the Agency made a good faith effort to locate father.

*Section 361.2*

Section 361.2, which "applies only when the minor is first removed from the custodial parent, generally at the time of the disposition hearing," "requires that a depend[e]nt minor who has been removed from his or her custodial parent be placed with the minor's noncustodial parent, *if that parent requests custody*, unless such placement would be detrimental to the minor."[4] (*In re Liam L.* (2015) 240 Cal.App.4th 1068, 1073 (*Liam L.*), italics added.)

---

[4] Section 361.2, subdivision (a) provides: "If a court orders removal of a child pursuant to Section 361, the court shall first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child. If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child. . . ."

"While [section] 361.2 clearly states that it applies 'when a court orders removal of a child pursuant to [section] 361,' a few cases have applied this standard at post-dispositional hearings." (Seiser & Kumli, Cal. Juvenile Courts Practice & Procedure (2021), § 2.127.) However, these cases involved circumstances not present here. (See, e.g., *In re Jonathan P.* (2014) 226 Cal.App.4th 1240, 1245, 1255–1256 [the father—who had a pre-dependency primary custody order and came forward prior to the six-month review hearing and "immediately and repeatedly requested custody"—was entitled to section 361.2 adjudication after a due diligence declaration indicated there was no response to a mailed notice on the same day the notice had been sent, and after the social worker waited over a month to contact father despite having his information]; *In re Suhey G.* (2013) 221 Cal.App.4th

20

Here, father never asked for custody. Instead, he repeatedly asked that the court (a) find that "[s]earch efforts to locate [him] were inadequate" and "notice was not provided according to law;" (b) order "the section 366.26 hearing . . . stayed"; and (c) "set aside all prior findings and orders made without notice to Father, *allowing* [*him*] *to participate in this case as* [*minor's*] *legal father*." (Italics added.)

Father contends his petition must be liberally construed and, citing to "item #8" and his memorandum of points and authorities, asserts he "made it clear that [he] was also asking for placement of the child with him." However, father's response to item No. 8, which asked "What new order or orders do you want the judge to make now?" states: "[S]et aside all findings and orders made without notice to [father] including the jurisdictional finding and orders of Minor was described by [section] 300(b) and (g); the dispositional findings and orders placing the child in the care of non-relatives, the 6-month review findings and orders, the 12-month review findings and orders, the findings and orders of Sept. 26, 2018, March 6, 2019, Aug. 21, 2019, Aug. 28, 2019, Oct. 17, 2019, and see the attached 18 pages." His memorandum of points and authorities, under the heading "A Motion pursuant to [section] 388 is the Proper Remedy for A Non-Custodial Parent Who is Seeking Custody Post-Disposition," (boldface omitted) likewise states: "Here, Father, the non-custodial parent of the Minor, is seeking to set aside all findings and orders prior to his appearance. . . . He has met the two-prong burden to be provided relief pursuant to [section] 388 because he is making a

732, 744–745 [the father—who came forward at the six-month review hearing—was "entitled to have his claim for custody adjudicated under section 361.2" because the Department conceded it failed to properly notify father after it repeatedly attempted to serve him at an address in a "fictional town"].)

21

late appearance in the proceedings through no fault of his own and it is in the Minor's best interest because the non-custodial Father is seeking to *reunify* with his child post-disposition." (Italics added.) He later stated in conclusion, "Father, the non-custodial parent hereby invokes the remedy afforded to him pursuant to [section] 388 in order to preserve his constitutionally protected interest in reunifying with his child."

In short, what father never asked for, in either his petition or supporting memorandum, was custody or placement of minor.

Moreover, this was the third petition father filed, yet he never clarified or directly stated he wanted custody of minor. And this remained the case even though, at the hearing on father's first petition, the court pointed out there was no request for custody or placement. The court told father's counsel, "all we're talking about is, is it in the best interest of the child to do what you're requesting? Here, in your motion, even in your motion, just so we're clear: If we were to look at your motion . . . you're just asking that I set aside all of the findings that occurred. [¶] You're not even asking—I mean, the request here, is not—it's not about custody. You're asking that we go back to square one. [¶] . . . I just want to be clear where we are: I'm taking into consideration, your request to set aside certain orders, specifically, jurisdiction and then setting a .26. [¶] But you're also asking everything be set aside. I'm looking at that. That's not—that doesn't speak to custody." Despite this exchange, father filed essentially the same petition two more times, seeking the same relief.

Further, at the November 9 section 366.26 hearing, the court, in addressing father's section 388 petition stated, "My expectation when I saw a [section 388 petition] was that it would be around facilitating visits, or contact, or communication between [minor] and his father. But to be clear,

there's not a request necessarily even for placement." Father's counsel never stated he was requesting custody but instead went on to argue once again that father was seeking "to set aside all findings and orders" and that he was *"requesting services and the ability to reunify*." (Italics added.) However, reuniting with a child is distinct from seeking legal or physical custody. (See *Liam L, supra*, 240 Cal.App.4th at p. 1083 [distinguishing between a noncustodial father's efforts to reunite with his children and an actual request for custody or placement].)

Thus, the record also amply demonstrates that father never requested custody of minor and section 361.2 is therefore inapplicable. (*In re A.A.* (2012) 203 Cal.App.4th 597, 605 ["It is the noncustodial parent's request for custody that triggers application of section 361.2 . . . ; where the noncustodial parent makes no such request, the statute is not applicable."].)

Father's reliance on *Liam L.* for the proposition that even if the Agency "conducted a diligent search," his "section 388 petition was the appropriate vehicle for him to step forward post disposition and seek an order placing the child in his care," is misplaced.

In *Liam L.*, the noncustodial father was present at the disposition hearing but did not request custody at that time and no detriment finding was made. He then "worked with the Agency to develop a relationship with the minors prior to requesting custody" at the 12-month review hearing. (*Liam L., supra*, 240 Cal.App4th at pp. 1077, 1083.) Under those circumstances, the Court of Appeal concluded the noncustodial father could seek placement by means of a section 388 petition. (*Liam L.,* at p. 1083.)

The appellate court acknowledged that normally, under section 388, the petitioner bears the burden of making a prima facie showing that a change of circumstance exists and that the proposed change of order promotes the best

interest of the child to trigger the right to an evidentiary hearing. (*Liam L.*, *supra*, 240 Cal.App.4th at p. 1084.) However, the court concluded that given the underlying presumption in the California statutory dependency scheme that a child should be placed with his or her parents, placement with a noncustodial parent is "inherently" in the child's best interest, absent a finding of detriment. (*Id.* at pp. 1073, 1085.) Therefore, "[a] noncustodial parent . . . makes a prima facie case of best interests, under section 388, when the noncustodial parent requests custody of the dependent child postdisposition," and a noncustodial parent is entitled to custody unless the party opposing placement establishes that such placement would be detrimental. (*Id.* at pp. 1085–1086.)

Here, however, father never requested custody. Nor did he, even after notice, step forward to "develop[] a positive relationship with the minor[]." (*Liam L., supra*, 240 Cal.App.4th at pp. 1083–1087.) To the contrary, even though nearly a year passed between his first contact with the Agency and the filing of the section 388 petition at issue, father not once contacted the Agency to request visitation with minor. Thus, by the time of his third petition, he had not seen minor in over seven years and had not spoken to him in five years.

*Minor's Best Interests*

Other than relying on case and statutory authority providing a prima facie case of best interest *if a noncustodial parent seeks custody*—none of which is applicable since father never asked for custody—father provides no explanation why it would be in minor's best interest to go "back to square one." He likewise provided no such explanation when the juvenile court asked him to explain how his requested relief was in the best interests of the

24

minor. Accordingly, there was no abuse of discretion in denying his section 388 petition.

"It is not always possible to litigate a dependency case with all parties present. The law recognizes this and requires only reasonable efforts to search for and notice missing parents. Where reasonable efforts have been made, a dependency case properly proceeds. If a missing parent later surfaces, it does not automatically follow that the best interests of the child will be promoted by going back to square one and relitigating the case. Children need stability and permanence in their lives, not protracted legal proceedings that prolong uncertainty for them. Further, the very nature of determining a child's best interests call for a case-by-case analysis, not a mechanical rule." (*Justice P., supra*, 123 Cal.App.4th at p.191; *In re J.H.* (2007) 158 Cal.App.4th 174, 182–183.)

Here, minor has experienced significant turmoil in his life and suffers from posttraumatic stress disorder, selective mutism, and major depressive disorder. In fact, he has been emotionally so adverse to change, that he has been prescribed psychotropic medication to help him cope with anxiety in new situations. Father had not spoken to minor for at least three to five years and had not seen him for at least seven years. And neither on appeal, nor in the juvenile court, has father proffered any reason why re-litigating this dependency proceeding from the beginning would be in minor's best interest.

In sum, the juvenile court did not come close to abusing its discretion in summarily denying father's final section 388 petition.

## DISPOSITION

The juvenile court order summarily denying father's section 388 petition is affirmed.

25

_____

Banke, J.

We concur:

_____

Margulies, Acting P.J.

_____

Sanchez, J.

A161456, In re EF

26